**Albert BURELLE; Bliss Woodruff**

v.

**CITY OF NASHUA; James W. Donchess,[1] individually and officially as Mayor of the City of Nashua; Irving Gallant, individually and as Treasurer for the City of Nashua; Noel Trottier, individually and as Director of Department of Parks and Recreation of the City of Nashua.**

Civ. No. 82–705–D.

United States District Court,
D. New Hampshire.

Dec. 18, 1984.

---

**1.** Originally named as a defendant, Maurice L. Arel was, at the time this litigation commenced, the Mayor of the defendant City. His replacement is James W. Donchess, the recent victor in a special mayoral election. Mr. Donchess is accordingly herewith substituted as a party defendant pursuant to the provisions of Rule 25(d), Fed.R.Civ.P.

I. Michael Winograd, Concord, N.H., for plaintiffs.

Steven A. Bolton, Nashua, N.H., for defendants.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

The United States was founded by persons who fled largely from religious persecution. Indeed, when the new states debated the proposed federal constitution, the proponents of that charter of freedom made clear that established religion was to be therein prohibited.[2]

Frightened by what they perceive to be forces of darkness, some Americans in the modern age seek to exorcise their fears by insistence upon religious conformity. In so doing, they disregard the sensitivity of equally loyal citizens whose approach to the most private matter of religious belief differs from their own.

The instant litigation is one of numerous unnecessary controversies arising from the perceived use of publicly-owned property to espouse tenets of an individual religious belief. It concerns the propriety of the erection and maintenance of a privately-owned crèche, or Nativity scene, on the grounds of the building which houses the municipal government offices of the City of Nashua, New Hampshire. A litigation of this class has recently been described by a contemporary political columnist, who is a sometime Presidential debate coach, as "unneighborly",[3] but it nevertheless involves significant constitutional questions.

The relief sought by these plaintiffs is injunctive in nature. In turn, the Court must therefore consider whether plaintiffs will suffer irreparable injury if the injunction is denied, whether such injury outweighs any harm that injunctive relief would cause the defendants, whether plaintiffs have a likelihood of succeeding on the merits, and whether the public interest would not be harmed by a preliminary injunction. *Wald v. Regan,* 708 F.2d 794, 801 (1st Cir.1983), *rev'd on other grounds, sub nom., Regan v. Wald,* — U.S. —, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *San Francisco Real Estate Investors v. Real Estate, et al.,* 701 F.2d 1000, 1002 (1st Cir.1983). It is, of course, elemental that loss of First Amendment freedom for even minimal periods of time unquestionably constitutes irreparable harm. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673,

---

**2.** In the course of the June 1788 debates in Virginia on the proposal to adopt the constitution, James Madison stated, in relevant part:

The honorable member has introduced the subject of religion. Religion is not guarded; there is no bill of rights declaring that religion should be secure. Is a bill of rights a security for religion? Would the bill of rights, in this state, exempt the people from paying for the support of one particular sect, if such sect were exclusively established by law? If there were a majority of one sect, a bill of rights would be a poor protection for liberty. Happily for the states, they enjoy the utmost freedom of religion. This freedom arises from that multiplicity of sects which pervades America, and which is the best and only security of religious liberty in any society; for where there is such a variety of sects, there cannot be a majority of any one sect to oppress and persecute the rest. Fortunately for this commonwealth, a majority of the people are decidedly against any exclusive establishment. I believe it to be so in the other states. There is not a shadow of right in the general government to intermeddle with religion. Its least interference with it would be a most flagrant usurpation. I can appeal to my uniform conduct on this subject, that I have warmly supported religious freedom. It is better that this security should be depended upon from the general legislature, than from one particular state. A particular state might concur in one religious project. But the United States abound in such a variety of sects, that it is a strong security against religious persecution; and it is sufficient to authorize a conclusion, that no one sect will ever be able to outnumber or depress the rest.

Vol. III, *Elliot's Debates on the Federal Constitution,* p. 330 (J.B. Lippincott Co. 1901).

**3.** *See* Will, George F., "First Amendment Fanatics in Season", p. 108, *Newsweek,* Dec. 17, 1984.

2689, 49 L.Ed.2d 547 (1976) (plurality opinion by Brennan, J.).

Briefly stated, the relevant facts are as follows. For a number of years prior to December 1982, defendant City owned, erected, and displayed the crèche in question on its City Hall plaza, a piece of ground between the sidewalk proper and the front of the City Hall building. Upon the original filing of this litigation in that month and year, the City conveyed all of its right, title, and interest in and to the crèche and its components to Heart of Nashua Foundation, Inc. ("Foundation"), a non-profit corporation composed of a group of downtown merchants. Deft.Ex.A. At the same time, defendant City granted to Foundation a license to erect and maintain holiday scenes and decorations between November 1 and the following January 31 over various streets and sidewalks in Nashua "together with the plaza in front of the Main Street entrance to City Hall". Deft. Ex.B. Since December 1982, therefore, Foundation has stored and erected the crèche at its own expense. However, the crèche has always been placed in a prominent position on the City Hall plaza, unadorned with any secular symbols of the holiday season.

Plaintiff Woodruff,[4] an architect by profession, and a resident taxpayer of the City of Nashua, professes a religious belief other than that which accepts Christ to be the Son of God.[5] On the morning of the day of hearing, he viewed the crèche, which, as it had been observed by him for many years, stood in the same prominent position alone on the plaza of City Hall between the sidewalk and front entrance of the municipal building. No secular symbols accompanied the free-standing crèche, nor were there any disclaimer signs announcing to those of the viewing public that the Nativity scene was in fact the property of and erected by Foundation.

Woodruff testified that he felt that such display of a religious symbol caused him to sustain irreparable harm, as it conveyed the message that the Trinitarian form of Christianity was the religion favored by his municipal government and that those who did not follow such beliefs were, of necessity, second-class citizens.

It appears that over the years defendant City has granted to various religious and philanthropic groups free licenses to use the plaza area for fund raising and other such activities. None of such events, however, have apparently lasted more than twenty-four hours or been of permanent placement around-the-clock over a period of time.

Reverend Alden Flanders, an Episcopal priest and teacher of religion at St. Paul's School in Concord, New Hampshire, testified that the crèche is definitely a religious symbol, denoting to those who see it memory of the birth of the Christ Child. While the birth of Christ is a historical fact, the witness testified that the Wise Men, shepherds, and other attendants at the Nativity scene have not so been verified.

Before moving to discussion of the particulars of the legal rules here applicable, the Court first turns to the contention of defendants that the matter cannot proceed without the necessary presence of Foundation. Presumably grounded on Rule 19(a), Fed.R.Civ.P.,[6] the thrust of this

---

4. Suit was brought originally solely in the name of Albert Burelle, but when it was discovered that although a Nashua resident he was not a taxpayer, plaintiff Woodruff joined the action as a plaintiff in early December 1982.

5. Plaintiff's belief is Unitarian, i.e., the form of Christianity that denies the doctrine of the Trinity, believing that God exists only in one person. *See The New Columbia Encyclopedia*, p. 2828 (1975).

6. In relevant part, Rule 19(a), Fed.R.Civ.P., provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple,

argument is that without Foundation before it, the Court will be unable to fashion an order which will solve the problems here raised. Guided, as it must be, by the pragmatic considerations which turn on the particular facts of this case, *Lopez v. Arraras*, 606 F.2d 347, 353 (1st Cir.1979) (and authorities therein cited), the Court determines that in "equity and good conscience", Rule 19(b), Fed.R.Civ.P.,[7] this action can proceed without the presence of Foundation.

The First Amendment to the Constitution of the United States provides in pertinent part that "Congress shall make no law respecting an establishment of religion...." Applicable to the states, *Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), the Establishment Clause, when litigated, has presented "especially difficult questions of interpretation and application". *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983).

On its facts, the instant case is strikingly similar to *McCreary v. Stone*, 575 F.Supp. 1112 (S.D.N.Y.1983), *rev'd*, 739 F.2d 716 (2d Cir.1984), *cert. granted sub nom., Village of Scarsdale Board of Trustees v. McCreary*, — U.S. —, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984). In that case, the Village governing body, its board of trustees, denied certain private groups access to a public park for the purpose of displaying a privately-owned crèche. Such display had in fact been permitted in prior years, albeit amidst growing acrimony. Attempts to moderate the dispute by removal of the crèche to private property were rejected by its sponsors, who claimed constitutional validity for their "tradition" of display of the crèche in the public park. The Village trustees having denied access to the park for such purpose, the protagonists of such display brought suit.

In a thorough and scholarly opinion, the trial court found that (1) the placing of a religious symbol—the crèche—on public land converted such public land into a bearer of a religious message; and (2) in such instance, members of the public would assume that the religious message thus depicted was supported by the municipal government. *McCreary v. Stone, supra*, 575 F.Supp. at 1130–31. In so ruling, the court distinguished other past usages of the park, such as church picnics, use of public buildings for religious ceremonies, use of public ways to raise funds for religious philanthropies, or the saying of prayers or giving of benediction at holiday gatherings on public property. This distinction was based on the fact that, in contrast to such public gathering usages, both the supporters of and objectors to display of the crèche on public property assumed their respective positions precisely because such usage gave an aura of Village support to the crèche. *Id.* at 1131. The court therefore held that the Village acted properly in accordance with the requirements of the Establishment Clause in denying access to the public park for display of the crèche.

Subsequent to the decision of the trial court in *McCreary, supra*, the Supreme Court handed down its decision in *Lynch v. Donnelly*, — U.S. —, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In that case, the Court held that a publicly-owned crèche which was included in an annual holiday display

---

or otherwise inconsistent obligations by reason of his claimed interest.

**7.** Rule 19(b), Fed.R.Civ.P., provides in pertinent part:

If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

erected by the City of Pawtucket, Rhode Island, in a private park was not violative of the Establishment Clause. As the crèche was but one part of a display which included such secular symbols of the holiday season as "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS'", as well as the crèche, 104 S.Ct. at 1358, the creation of such display fell within the parameters of a legitimate secular purpose. *Id.* 104 S.Ct. at 1363.

> If the presence of the crèche *in this display* violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.

*Lynch v. Donnelly, supra,* 104 S.Ct. 1365 (emphasis added).

However, when *McCreary v. Stone* reached the Second Circuit, a panel of that court read *Lynch v. Donnelly, supra,* as if it could be divorced from its facts. Seizing on language in *Lynch* that focus on the crèche was based "in the context of the Christmas season", *Lynch v. Donnelly, supra,* 104 S.Ct. at 1362, the Second Circuit rejected the factual distinction, transposing secular decorations dispersed throughout the village of Scarsdale, and equating the singing of Christmas carols in the park at issue as if they were continuously present with the crèche in said park. *McCreary v. Stone,* 739 F.2d at 728, 729.

This Court has read and re-read *Lynch v. Donnelly, supra.* With all due respect to the illustrious scholars who comprised the decisional panel of the Second Circuit, this judge disagrees. In so doing, the Court does not stand alone, for in *American Civil Liberties Union v. City of Birmingham,* 588 F.Supp. 1337 (E.D.Mich.1984), the chal-

lenge posed was contained in a suit brought by a municipal taxpayer who objected to the placement and maintenance of a crèche by the City on the lawn of the City Hall. In ruling that *Lynch v. Donnelly, supra,* should not be read as holding "that a nativity scene standing alone, or that any other single religious symbol or group of such symbols erected on public property with public funds, complies with the requirements of the separation of church and state required by our Constitution", 588 F.Supp. at 1339, the Court also reviewed the ruling of the Second Circuit in *McCreary v. Stone, supra.* With regard to such decision, the Court stated, in pertinent part:

> This court cannot discover the clarity in the *Lynch* decision upon which the *McCreary* court expounds. The close decision in *Lynch* included a lengthy discussion which noted specifically the secular details of the display which it found to be constitutionally acceptable.

*American Civil Liberties Union v. City of Birmingham, supra,* 588 F.Supp. at 1340.

Defendant City here makes much of the fact that on utility poles and lampposts without its sidewalk, and on the second floor of its City Hall, there are many secular symbols, such as trees and lights, erected by Foundation.[8] The nearest of these objects is on the outer side of the sidewalk, at least ten feet away from the crèche standing alone within the plaza, and the City Hall decorations are some twenty-five to thirty feet to the rear of and above such crèche. There are no signs visible to the passerby advising that the crèche is in fact privately owned and that the doctrine which it depicts is neither supported nor disfavored by the municipal government. To reasonable persons so passing, I find and rule, the display of the crèche indicates that the municipal government of Nashua

---

**8.** The second floor of City Hall is apparently garlanded with lights and a large sign reading "NOEL". Although that term currently connotes merely the Christmas season, its deriva-

tion is "birthday", and it therefore has distinct reference to the birth of Christ. *See Webster's Third New International Dictionary* at 1533 (G. & C. Merriam Company 1976).

believes that the Trinitarian theory of Christianity is a favored religious doctrine.[9]

When the perceived governmental practice is challenged under the Establishment Clause, the applicable criteria are as follows:

First, the practice must have a secular legislative purpose;

Second, its principal or primary effect must be one that neither advances nor inhibits religion; and

■ Finally, it must not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). On the evidence of record here presented, I find and rule that there is nothing to support a finding of a secular purpose for the display of this Nativity scene, standing alone on the City Hall plaza. The decorations along the public ways and on the City Hall building do not serve to overshadow, balance, or neutralize the symbol of the Trinitarian doctrine of Christianity. *See American Civil Liberties Union v. City of Birmingham, supra*, 588 F.Supp. at 1339. Additionally, the primary effect of the display of this crèche without change from its display in prior years conveys to the public observing its display the implicit government support of the religious doctrine represented by the sacred figures therein. The fact that public monies are not used for such display does not serve to dispel the aura that the municipal government of Nashua has excessively entangled itself with a religious doctrine which is not shared by all of its taxpaying citizens.

Despite the contentions of counsel for the defendant City, the Court finds and rules that by enjoining continuation of the license to maintain a religious display, standing alone, without accompaniment of such secular symbols or disclaimers that would announce to the public the City's disinterest in the religious features of such display, sufficient relief can be afforded to the parties herein without addition of the licensee or any other parties. In short, the irreparable harm demonstrated to plaintiffs and others of similar feelings with respect to this religious display on municipal property and the probability of success on the merits outweigh any harm that could be expected to befall either the licensor, City of Nashua, or the licensee, Foundation, herein. A separate order of injunction issues herewith this date.

SO ORDERED.

## ORDER OF INJUNCTION

The defendants, City of Nashua; James W. Donchess, individually and officially as Mayor of the City of Nashua; Irving Gallant, individually and as Treasurer for the City of Nashua; Noel Trottier, individually and as Director of the Department of Parks and Recreation of the City of Nashua, their agents, servants, employees, and all others acting in cooperation and concert with said defendants are herewith enjoined from this date forward from continuing in effect the terms of a license issued by defendant City of Nashua to Heart of Nashua Foundation, Inc., on December 15, 1982, insofar as said terms concern the use of the "plaza in front of the Main Street entrance to City Hall" or the erection and maintenance of a crèche, or Nativity scene, standing alone without signs disclaiming the ownership or support of the municipal government of the City of Nashua for the religious doctrine embodied by the sacred figures of said crèche or, alternatively, without secular symbols of the holiday season juxtaposed within the plaza grounds whereon said crèche is currently situated. In the event the licensee desires to maintain said crèche, any disclaimer signs shall be of size equal to the term "NOEL" printed on the front of the building which houses the municipal offices of the City of Nashua and thus readily visible to passers-by.

---

9. Indeed, in remanding to the trial court, the Second Circuit in *McCreary v. Stone, supra*, directed that proceedings should be conducted and an order entered "concerning the size, visibility, and message of an appropriate disclaimer sign or signs" to be appended to the privately-owned crèche to be displayed in the public park at issue. *Id.*, 739 F.2d at 728.

Defendants shall notify the licensee, Heart of Nashua Foundation, Inc., and all of its employees engaged in the issuance of licenses for the use of City Hall plaza as aforesaid of the terms of this Order of Injunction and of the Opinion this date issued which sets forth the reasons therefor.

SO ORDERED.