**Renee LIBIN, et al.**

v.

**TOWN OF GREENWICH, et al.**

**Civ. No. B–84–805(EBB).**

United States District Court,
D. Connecticut.

Dec. 10, 1985.

Martin Margulies, University of Bridgeport Law School, Bridgeport, Conn., Ralph D. Clifford, Stamford, Conn., Martha Stone, Shelley Geballe, Hartford, Conn., for plaintiffs.

John E. Meerbergen, Valerie A. Luoma, William T. Lapcevic, Joseph P. Secola, Greenwich, Conn., for defendants.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

ELLEN B. BURNS, District Judge.

This case requires the court to decide whether a volunteer fire company may place a cross on the facade of a firehouse as part of a display celebrating the Christmas holiday. Some may view this case as much ado about nothing—several lawyers filing mounds of paper to resolve a symbolic dispute. Others, viewing the same case, will see a momentous struggle between values that are basic to the moral fiber of our nation. It is the duty of this court to take a dispassionate approach to the controversy—to recognize that symbols speak important messages, but to view those symbols in the context of this particular case.

### I. *Facts*

The following facts appear to be undisputed. The Cos Cob Volunteer Fire Company (the "Company") has decorated the fire station on the Post Road in Greenwich for the Christmas holiday for at least the past thirty years. Although the composition of this Christmas display has varied over the years, a three by five foot illuminated cross has always played a central role. Past displays have included decorated trees, a star, and candy canes. Several of these ornaments have disappeared during the past few years so that the cross, together with three wreaths and a few strings of lights, now constitute the entire Christmas display.

The charter of the Town of Greenwich (the "Town") establishes a Fire Department (the "Department") under the supervision and control of the First Selectman. The Board of Selectmen is authorized to make rules and regulations to govern the Department and its members. The Greenwich Municipal Code divides responsibility for different geographic regions within the Town among several volunteer fire companies. The Code recognizes that the Department consists of both volunteer and paid members and establishes the Chief of the Town Fire Department (the "Chief") as supervisor of the volunteer companies and the paid firemen. Greenwich Municipal Code, Art. 14. The Chief is authorized to adopt rules and regulations that are not inconsistent with regulations adopted by the Board of Selectmen and also not inconsistent with the by-laws of the volunteer fire companies. The regulations adopted by the Chief require equal treatment of paid and volunteer personnel of the Department "while recognizing that differences inherent in volunteer and paid employment may affect the impact of some practices." Greenwich Fire Department Rules and Regulations, § 1–9.

The Town provides the Company with firefighting and emergency vehicles, liability insurance, fuel and firefighting equipment. The Company also owns some equipment. The Town provides eight paid employees to man the Cos Cob firehouse to insure around-the-clock coverage. The Town provides the members of the Company with worker's compensation insurance, as required by state law. Conn.Gen.Stat. § 7–314a. The Town is also liable for any damages caused by members of the Company in the performance of their duties. Conn.Gen.Stat. § 7–308. The Company administers its own budget with its own funds and does not require approval of the Board of Selectmen before making expenditures. The Town owns the firehouse in

question and permits the Company to use the building without payment of rent. The Town also pays for all utility and maintenance expenses for the building.

## II.  Standards for Preliminary Relief

The standard for granting a preliminary injunction in this circuit is well established. The party seeking the injunction must first establish that it will experience irreparable injury if the requested relief is not granted. *Holt v. Continental Group, Inc.,* 708 F.2d 87, 90 (2d Cir.1983). To establish such irreparable injury based upon a First Amendment violation the party must show that " 'First Amendment interests were either threatened or in fact being impaired at the time the relief was sought.' " *American Postal Workers Union v. United Postal Service,* 766 F.2d 715, 722 (2d Cir. 1985), (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976)).

If irreparable injury is established, the party seeking the injunction must then show the likelihood that it will succeed on the merits. If it can show a probability of success, the preliminary injunction should issue. *Coca Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314 (2d Cir.1982). The injunction should also issue if the party seeking the relief raises sufficiently serious questions going to the merits to make them a fair ground for litigation and shows a balance of hardships tipping decidedly in its favor. *Id.*

The plaintiffs have alleged that the defendants have violated their rights under the establishment clause of the First Amendment by placing a cross on Town property. A continuing violation of First Amendment rights has frequently been held to establish irreparable injury *per se.* *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion); *414 Theater Corp. v. Murphy,* 499 F.2d 1155, 1160 (2d Cir.1974); *Annunziato v. New Haven Bd. of Alderman,* 555 F.Supp. 427, 432 (D.Conn.1982). There is no question that a violation of the plaintiffs' First Amendment rights cannot be remedied by an award of monetary damages. The alleged violation of plaintiffs' rights under the establishment clause would constitute irreparable injury if proven. *Annunziato, supra.* Therefore, it is only necessary to address plaintiffs' likelihood of success on the merits.

## III.  Likelihood of Success on the Merits

### A.  Cos Cob Fire Company as a State Actor

By its terms, the First Amendment is only a limitation upon the federal government's authority to establish or promote religion. However, the Fourteenth Amendment's limitation upon the authority of the states to deprive their citizens of due process has long been held as imposing the strictures of the First Amendment upon the States. *Wallace v. Jaffree,* ― U.S. ―, ―, 105 S.Ct. 2479, 2486, 86 L.Ed.2d 29 (1985); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

The question of whether or not the Company is a state actor for First Amendment purposes is important for two reasons. First, if the Company is a state actor, it is barred by the First and Fourteenth Amendments from taking any action which violates the establishment clause. Second, as a state actor the Company cannot assert its own First Amendment right to free expression as a defense to any establishment clause violation. This second point is of great significance in light of the Second Circuit's recent decision in *McCreary v. Stone,* 739 F.2d 716 (1984), aff'd by an equally divided court, ― U.S. ―, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985).

In *McCreary,* a private citizen group sought permission from the Village of Scarsdale to place a creche in a public park during the Christmas holiday season. Although the village had given permission for such a display in years past, it changed its policy and refused to grant permission. The citizen group sued, claiming they had been deprived of their First Amendment right to free expression. The Second Circuit ruled that, once a municipality opens a

public forum to its citizens, it cannot bar access to that forum simply because of the religious nature of the intended speech. *McCreary*, 739 F.2d at 727, 730.

If the Company is, in fact, a private actor, it may well claim that it cannot be prevented from putting up a cross in a public forum.[1]

Although there is little law on the subject, it must be obvious that a state actor does not have a First Amendment right of free expression, at least in those situations in which such a right would conflict with the First Amendment rights of citizens. *See* Yudoff, *When Government Speaks*, 42–50 (1983). This result is implicit in all of the cases of the United States Supreme Court involving the establishment clause. · In all of those cases the Court limited itself to resolution of the single question of whether the government's action amounted to the establishment or promotion of religion. There was no discussion of any countervailing right inherent in the governmental agency to express its views on religion. Furthermore, the guarantees contained in the Bill of Rights are limitations on the rights of the government for the benefit of its citizens. These provisions cannot be construed as a grant to government of the very powers which the Constitution sought to limit.

■ An examination of the facts of this case shows that the Company is in fact a state actor. In *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17 (2d Cir.1979), the court analyzed whether a Connecticut volunteer fire department was a state actor subject to the strictures of the First Amendment. After analyzing state law, the governing structure of the volunteer fire department, and the interrelationship between the fire department and the town, the court found that the department was a state actor. *Id.* at 25. The court based its analysis primarily upon the "public function" test set forth in *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) and *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The court observed that state law authorized towns to assume responsibility for fire protection, and once such responsibility was assumed it became a public function, even though that function may be delegated to a volunteer organization. *Janusaitis*, 607 F.2d at 24.

The defendants seek to distinguish themselves from the fire department involved in *Janusaitis*. First they argue that there is no agreement between the Town and the Company as required by Conn.Gen.Stat. § 7–301. However, the statute does not require a written agreement. A review of the Town Charter, Municipal Code, Fire Department Rules and Regulations, and the Company's By-laws demonstrates an implicit agreement between the Town and the Company. The history of the relationship and the official recognition of the role of volunteer fire companies establish a clear understanding that volunteer companies will be the major force in protecting the Town from the hazards of fire. The documents earlier referred to establish a close interconnection between the paid Town fire officials, the board of selectmen, and the volunteer companies. In fact these interconnections appear to be more significant than those presented in *Janusaitis*.[2]

---

1. The Company and Town have steadfastly maintained that the facade of the firehouse is a public forum, at least for the purposes of putting up seasonal displays. Although the court finds this contention weak on the record as it now stands, the finding that the Company is a state actor obviates the need to address the public forum question.

2. The Company also claims that it is different from the Middlebury Fire Department because it owns some of the equipment it uses. However, it is undisputed that it also uses a substantial amount of equipment owned by the Town as well as the Town-owned firehouse. Furthermore, although the Company owns some equipment, the Town is ultimately responsible for insuring that that equipment is properly maintained. *See* Rules and Regulations, § 7–9.3.1. The Company also argues that the Town does not pass upon its expenditures as it does other Town agencies. However, this slight anomaly does not counter the great abundance of factors weighing in favor of finding state action.

The near "symbiotic relationship" between the Town and the Company requires the conclusion that the Company is, in fact, a state actor. *Janusaitis* at 22, (citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

### B. *Standards For Establishment Clause Analysis*

The parties appear to agree that this case is controlled by the analysis set forth by the Supreme Court in the case of *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In *Lynch*, the City of Pawtucket, Rhode Island, erected a large Christmas display in a privately owned park located in the city's major business district. The display included, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, a Christmas tree, carolers, cut-out figures of numerous characters, hundreds of colored lights, and a creche. The plaintiffs challenged the inclusion of the creche in the display, arguing that the creche was a purely religious symbol, the use of which in a municipally sponsored display violated the establishment clause.

The Court analyzed the plaintiffs' argument under the approach which it had established in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). This approach entails a three-pronged analysis. First, the court determines whether there is a secular purpose for the governmental action. If there is no secular purpose, the governmental action is invalid. *Lynch*, 465 U.S. at 679, 104 S.Ct. at 1362. If a secular purpose is found, the Court proceeds to determine whether the "primary effect" of the governmental action is to advance religion. *Id.* at 681, 104 S.Ct. at 1363. If the effect of the action is merely an incidental, indirect, or remote benefit to religion, it will withstand scrutiny under this second prong. *Id.* at 683, 104 S.Ct. at 1364. Finally, the court determines whether the governmental action will lead to excessive entanglement between religion and the state.

In *Lynch* the Court found that display of the creche involved the secular purpose of celebrating the National Holiday, Christmas. *Id.* at 681, 104 S.Ct. at 1363. Although the Court noted that a creche may have a religious meaning, it also has a secular meaning because it "depicts the historical origins of this traditional event long recognized as a National Holiday." *Id.* at 680, 104 S.Ct. at 1363. It further found that the availability of alternative, non-religious symbols to celebrate the holiday did not transform a permitted secular purpose to a forbidden non-secular one. *Id.* at 681, n. 7, 104 S.Ct. at 1363, n. 7. The Court also found that, although the creche may serve to advance religion, such an effect was merely incidental to the legitimate secular purpose of celebrating the origins of the National Holiday. *Id.* at 681, 104 S.Ct. at 1363. Finally, the Court agreed with the trial court's finding that the inclusion of the creche in a Christmas display did not involve excessive entanglement between religion and government. *Id.*

The parties agree that the instant case also presents no question of excessive entanglement between religion and government. However, they strongly disagree as to whether the display of the cross has a valid secular purpose and whether the primary effect of that display is the advancement of religion.

### C. *Does The Cross Serve A Secular Purpose?*

Plaintiffs argue that no secular purpose is served by the display of the cross on the

The Company also makes the novel argument that because the Rules and Regulations have not been challenged and upheld as valid, they should be disregarded in analyzing the relationship between the Town and the Company. This argument flies in the face of the presumption of validity accorded administrative regulations promulgated pursuant to express statutory authority. *Forester v. Consumer Product Safety Comm'n*, 559 F.2d 774, 783 (D.C.Cir.1977). At least until the Rules and Regulations are challenged and found to be without effect, this court must presume their validity.

firehouse. Recognizing that the Supreme Court found a secular purpose in the display of the creche in *Lynch, supra*, the plaintiffs have steadfastly maintained that "a cross is not a creche." This self-evident statement is shorthand for the plaintiffs' view that, although a creche is symbolic of the historic event celebrated by Christmas, the birth of Christ, the cross is representative of his death and has no symbolic connection with the Christmas holiday except as a religious symbol.

The defendants argue that the display of the cross is identical in effect to the display of the creche in *Lynch*. The creche and the cross, they argue, are religious symbols that have become closely associated with the Christmas holiday. If the cross is the same as a creche for purposes of celebrating Christmas, then it follows that the secular purpose found in *Lynch* will be equally applicable to the case at bar.

In *Lynch* the Court made clear its view that a governmental act passes the first prong of the *Lemon* test if it has a secular purpose, even though that act may also have a religious purpose and the secular purpose could be accomplished without resort to a religious symbol. 465 U.S. at 678–85, 104 S.Ct. at 1361–65. *Cf. Wallace v. Jaffree,* —— U.S. ——, ——, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985) ("the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion.")

The Court found just such a secular purpose in the display of the creche in *Lynch*. It noted that there has been a long history in which religious customs have become intertwined with governmental activities. As examples it cited the motto "In God We Trust" used on our currency; the phrase "One nation under God" used in the pledge of allegiance, and the celebration of Thanksgiving and Christmas, two national holidays with religious origins. The court considered the symbolism of the creche in light of this history. It is unquestioned that the holiday of Christmas celebrates the birth of Jesus Christ. It therefore appeared altogether fitting that a municipality celebrate that National Holiday with symbols referring to its origin.

When viewed in this context, the *Lynch* case is readily distinguishable from the one now before the court. The creche in *Lynch* had a symbolic meaning, the birth of Christ, connecting it to the holiday of Christmas quite apart from any religious significance that it might otherwise have. To the contrary, the only connection that a cross has to Christmas is as a religious symbol. There simply is no historical connection of a cross to Christmas except as a symbol of those Christian religions which accept Jesus Christ as a central figure.

Defendants have attempted to argue that, when viewed in the entire context of the firehouse display and of the larger display involving the Cos Cob business district, the cross takes on the secular purpose of adding to the blaze of light and color which is part of the traditional Christmas celebration. Of course, in viewing the purpose of the display of a cross, the court must look to the context of the Christmas holiday season. *Lynch*, 465 U.S. at 679–80, 104 S.Ct. at 1362; *McCreary v. Stone*, 739 F.2d at 729. However, the fact that the cross contributes to the light and color with which the Town celebrates Christmas is insufficient to establish a secular purpose. If this were true, any message, regardless of its religious content, would fall within the secular purpose of celebrating Christmas if brightly and colorfully lit at night.[3]

Defendants have further argued that, even if the cross is not a symbol connected to the historical origins of Christmas, it has nevertheless become a symbol traditionally associated with the holiday. Even if true, this alone does not establish a secular purpose. It is undeniable that Christmas is a religious as well as a secular holiday. To many, the celebration of Christmas is a celebration of the very origin of their reli-

---

**3.** The court doubts that defendants would argue that the message "Jesus Christ Is The Savior of Mankind" would meet the secular purpose test if brightly lit during the Christmas season. However, a brightly lit star, symbolic of the Star of Bethlehem, would meet this test.

gion. To these people, an association between Christmas and the cross, the preeminent symbol of the religion founded by him whose birth is celebrated, is a natural one to make. But this association exists only because of the religious meaning of the cross.[4]

Because the cross has no meaning in the context of the celebration of Christmas except as a religious symbol, there can be no secular purpose for including it in a Christmas display. The Company's use of the cross in its display therefore fails to pass the first prong of the *Lemon* test.

### D. Is The Primary Effect of the Cross the Advancement of Religion?

■ The second step of the *Lemon* analysis is the determination of whether the challenged conduct has the primary effect of advancing religion. A mere incidental endorsement of religion does not violate the establishment clause. In her concurring opinion in *Lynch,* Justice O'Conner adopted a useful method of analysis to help determine whether the primary effect of governmental action is to advance religion. 465 U.S. at 687–88, 104 S.Ct. at 1366–67.[5] To determine the effect of the government's action it is necessary to determine the message that the action actually conveys to its citizens. *Id.* at 690, 104 S.Ct. at 1367. "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Id.*

In following this analysis with respect to the creche, Justice O'Conner found that the government's celebration of a public holiday by use of "a traditional symbol of the holiday" could not "fairly be understood to convey a message of endorsement of religion." *Id.* at 693, 104 S.Ct. at 1369. Unlike the creche, a cross is not a symbol associated with the historical origins of Christmas or with its secular celebration. In order to connect the symbol of the cross to Christmas, one must look beyond the historical event celebrated by the holiday and into the religious meaning of the cross as a symbol of Christianity. The government's use of a cross to celebrate Christmas serves as an invitation to its citizens to make this religious connection. Such an invitation can be construed as a message endorsing the religious beliefs that allow the connection to be made.

Because the action of the Company in putting up a cross has the appearance of giving the government's mark of approval to a particular religious belief, that action fails the second prong of the *Lemon* test.

### IV. Conclusion

As with most cases involving First Amendment rights, this case focuses our attention on strongly held and conflicting values. The Supreme Court has recognized that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Yet the First Amendment demands that the government maintain a stance of neutrality toward religion. *See Lemon v. Kurtzman,* 403 U.S. at 622, 91 S.Ct. at 2115. This neutrality requires that government accommodate all religious views, without show-

---

**4.** The defendants have submitted an affidavit of a clergyman who states that it is his "pastoral view that the cross is not exclusively a religious or Christian symbol—it has been accepted in the ethos of our nation as a nonreligious symbol of peace and goodwill—the very things many people celebrate at Christmas." The plaintiffs, on the other hand, have submitted the affidavits of several ministers, a rabbi and theologians who attest that the cross is primarily a religious symbol and has no connection with the holiday of Christmas except as a religious symbol.

Webster's International Dictionary (2d ed., unabridged) lists nineteen meanings for the noun "cross." Eight of these refer to its religious symbolism. None of the definitions refer to its use as a symbol of peace and goodwill. Although not dispositive, this conforms to the court's own experience that the cross is primarily a religious symbol. Any secondary meaning as a symbol of peace appears to be derived from the teachings of Christ as set forth in the tenets of the Christian religions to which the cross is sacred.

**5.** A majority of the Court appears to have adopted this approach. *See Wallace v. Jaffree,* —— U.S. at ——, n. 42, 105 S.Ct. at 2490 n. 42.

**400**

ing a particular preference or hostility toward any. *Lynch, supra* 465 U.S. at 671, 104 S.Ct. at 1358.

The Cos Cob Volunteer Fire Company wishes to continue to display a cross as part of its holiday docorations as it has for some thirty years. To many members of this Company no doubt the cross has great meaning as a religious symbol, a meaning that they are proud to share with the citizens of their Town. However, as a representative of the municipal government, the Company is bound by the First Amendment to take a neutral stand with respect to religion.

■ The cross, in the context of Christmas, is a purely religious symbol. Unlike a creche, it has no historical connection to the holiday. The only purpose served by the display of the cross, even in the context of the Christmas holiday, is to express religious sentiment. The primary effect of the display is to give the appearance of governmental endorsement of particular religious views. Because of this purpose and this effect, display of the cross violates the plaintiffs' rights under the First and Fourteenth Amendments.

The plaintiffs have established that they will be irreparably harmed by the display of a cross on the Cos Cob firehouse. They have also established a probability that they will prevail on their claims. Accordingly, plaintiffs' motion for a preliminary injunction is granted and the defendants are enjoined from displaying a cross on the Cos Cob firehouse.

SO ORDERED.