Ronald I. MENDELSON, Plaintiff,

v.

CITY OF ST. CLOUD and Richard Word, in his official capacity as mayor of the City of St. Cloud, Defendants.

No. 87–205–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 23, 1989.

Lynne M. White, Akerman, Senterfitt & Eidson, Orlando, Fla., Howard S. Marks, Winter Park, Fla., Susan V. Wheeler, Orlando, Fla., for plaintiff.

Michael G. Williamson, Kimberly A. Ashby, Maguire, Voorhis & Wells, P.A., Orlando, Fla., for defendants.

G. KENDALL SHARP, District Judge.

## ORDER

This case was tried before the court without a jury. Based on facts stipulated by the parties in their joint pretrial stipulation, testimony, and evidence admitted at trial, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

This is a civil rights suit brought pursuant to 42 U.S.C.A. §§ 1983, 1988 (West 1981), and 28 U.S.C.A. §§ 2201–2202 (West 1982 & Supp.1989). Plaintiff challenges defendants' practice of displaying, maintaining, illuminating, or otherwise allowing (including by way of lease of space) a religious display in the form of an illuminated Latin cross atop the City of St. Cloud water tower in violation of the establishment clause of the first amendment to the United States Constitution. Plaintiff seeks both declaratory and injunctive relief. Defendants set forth three affirmative defenses: (1) defendants contend that plaintiff has no standing to bring this suit, because he is neither a

citizen of St. Cloud nor has he suffered a special or specific injury to give rise to a case and controversy; (2) defendants contend that the issues raised by plaintiff are moot, because subsequent to the filing of this lawsuit defendants leased the top of the tower to a private third party; and (3) defendants contend that the structure on the water tower has separate, secular, and historical value as a landmark and as a guidepost for fishermen and pilots.

The City of St. Cloud, Osceola County, Florida, owns the water tower and the land on which the tower is built. Across the center of the tower is printed in bold letters, "Welcome to St. Cloud." Above the welcome sign is the City seal. No other signs are apparent on or around the tower. Erected on top of the tower is a Latin cross (a cross with a base stem that is longer than its three other arms) that is twelve-feet tall. The cross is illuminated almost every evening. In addition to the cross, radio antennae are on the tower. The tower is the tallest advertising space in the City, and, save for a telephone relay station, it is also the City's tallest structure.

The cross has been on top of the water tower continuously since the late 1960s. The cross was a gift to the City, was put on the tower during the Christmas season, and was never removed. Prior to March 20, 1987, approximately one week after the filing of this action, the City bore all expenses for displaying, maintaining, and illuminating the cross. Because of the tower's height, the cross can be seen from private property, including residential homes, from United States Highway 192, from public Veterans' Park, and from many retail establishments in the community.

In response to a letter from the American Civil Liberties Union urging the removal of the cross, the City decided in November 1986 to divorce itself from the cross and to rent the tower's roof to gain revenue. The City passed an ordinance allowing the space to be used for advertising and display purposes, and the City advertised the space in the newspaper. The City received between six to fourteen bids. At the start of the bid process, the City did not know whether the bidders would keep the cross on the tower; the City received bids to use the space for other advertisement purposes. After the filing of this lawsuit, the City selected Space Coast Industries, Inc., (Space Coast) as the highest bidder. When the City entered into the lease with Space Coast, it knew Space Coast intended to keep the cross on the tower. The cross remained on the tower throughout the bid process and until the date of trial.

Under the terms of the lease with Space Coast, either party could terminate the agreement for any reason on sixty days' notice. Also, Space Coast could not remove the cross from the tower and replace it with another symbol without the City's written permission. Only the City and Space Coast had legal access to the tower's roof. As of January 9, 1989, the lease with Space Coast was the only lease the City had entered into within the past five years for the display of signs and/or advertisements on city owned property.

Space Coast defaulted on the lease, and the City sent advertisements to people it thought would be interested in leasing the top of the tower. The City received only one bid, which the City Manager placed on the City Council's consent agenda. The bid was accepted, and the City entered into a lease with "The Citizens for Majority Rights" (CMR). CMR took the lease in February 1989 with monthly payments to be made. The first lease payment that the group made, however, was on August 11, 1989, about one week before the start of the trial. Although the lease was in default for six months, the cross was illuminated each evening. The City's general policy in default cases is to cut off electrical power and give notice of default. But, throughout the leasing periods of Space Coast and CMR the cross was illuminated virtually every night, even though both entities were in default.

On March 10, 1987, plaintiff, Ronald I. Mendelson, filed a lawsuit against the City to have the cross removed. Plaintiff, a member of the Jewish faith, is a resident of Osceola County. He lives about six miles east of the St. Cloud city limits. He has

lived in the area with his family for about ten years. St. Cloud is the closest municipality to plaintiff's house, and plaintiff considers the City to be his community. His daughter attends school in St. Cloud. He has, however, never lived or voted in the City, received City police or fire protection, or been employed in the City. The City of St. Cloud Public Utilities supplies plaintiff's house with electricity; he has no other choice regarding selection of utility companies. When plaintiff pays his utility bill, he also pays a city tax or county service charge. Some of the money that plaintiff pays to the Utility Company goes into the City's general fund.

Plaintiff brought the suit to enjoin the City from displaying, maintaining, illuminating, or otherwise allowing the Latin cross atop the City owned and operated water tower to protect the constitutional guarantee of separation of church and state. Plaintiff contends that the display of the cross on a year round basis is defendants' endorsement of one religion over another. Moreover, plaintiff claims to be offended and frightened by the City's display of the cross on public property and feels excluded from the community. He does not go to the public Veterans' Park, to the lake front, or to the Fourth of July fireworks display, because all are in the "shadow of the cross." Moreover, to avoid seeing the cross, plaintiff travels many miles out of his way to other cities to shop and dine, which results in inconvenience to himself and his family. Nevertheless, plaintiff has to travel to or, at least, through the City between four and eight times a day in order to drive his wife to and from work and to drive his daughter to and from St. Cloud High School. When driving his daughter to school, he takes an indirect route that results in toll road expenses. Each time plaintiff travels to or through the City, he cannot reasonably avoid seeing the cross.

In response to plaintiff, defendants assert that the cross is a landmark for its citizens and others. When people see the cross they know they are in St. Cloud. As one witness stated: "I am comfortable with the lighted cross as the beacon of the land-

mark of our community." The witness also noted that the cross symbolizes a "comfort zone" that identifies "St. Cloud as home." Furthermore, defendants contend that the cross serves as a guidepost for fishermen on East Lake Tohoe as well as for pilots who fly into the local airpark. Thus, defendants argue that the removal of the cross would possibly cause harm to those pilots who rely on it to lead them to the airpark as well as to those fishermen who rely on it for guidance during inclement weather.

## CONCLUSIONS OF LAW

The court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1331 (West 1966 & Supp.1989) and 28 U.S.C.A. § 1343 (West 1976 & Supp.1989). Venue is proper in the court pursuant to 28 U.S.C.A. § 1391(b) (West 1976).

In reaching its decision, the court must analyze three issues. First, whether plaintiff has standing to bring this action. Second, whether the action is moot, because the City leased the top of the water tower to a private entity subsequent to the filing of this action. Third, whether the Latin cross atop a publicly owned water tower violates the establishment clause of the first amendment to the United States Constitution.

■ The first issue is whether plaintiff has standing to bring this action. Article III of the United States Constitution limits the judicial power of the federal courts to the resolution of cases and controversies. U.S. Const. art. III. In order to satisfy the case and controversy requirement, a plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Moreover, a plaintiff must show that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41, 38, 96 S.Ct. 1917, 1925, 1924, 48 L.Ed.2d 450 (1976). The United States Su-

preme Court has held that standing may be predicated on noneconomic injury. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 73–74, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978); *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).

In *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098 (11th Cir.1983), the Eleventh Circuit Court of Appeals held that plaintiffs had standing to sue the county and state to require the dismantling of a large, lighted cross located in a state park. The court based its decision on plaintiffs' good faith allegations that they would not camp in the state park so long as the cross was there. *Id.* at 1108 n. 18. Because plaintiffs were deprived of the beneficial use of the state park, the court found that plaintiffs "sufficiently demonstrated particular and personalized noneconomic injury to distinguish them from the general citizenry who may be as equally offended on a philosophical basis but who are not as specifically or perceptibly harmed...." *Id.* at 1108. Plaintiffs demonstrated an individualized injury, instead of "a mere psychological reaction...." *Id.*

In the case at hand, plaintiff has experienced injury equal to, if not greater than, plaintiffs in *Rabun County.* Plaintiff does not use the publicly owned Veterans' Park, visit the lake front, or attend the Fourth of July fireworks display, because each is in the "shadow of the cross." Moreover, plaintiff has testified that to avoid viewing the cross, he drives many miles out of his way to other cities to dine and shop. Furthermore, he detours from the most direct route to his daughter's high school and, consequently, incurs expense on the toll road. In *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265 (7th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986), the court held that plaintiffs had standing to challenge a cross atop the city fire station because they were "led to alter their behavior—to detour

at some inconvenience to themselves, around the streets they ordinarily use." *Id.* at 268.

The injuries experienced by plaintiff in this case can be fairly traced to the cross on top of the City's water tower; in addition, removal of the cross would likely redress plaintiff's injury. Although the costs to plaintiff may appear slight, the Supreme Court has shown that no minimum quantitative limit is necessary to establish injury. The Court stated:

'Injury in fact' ... serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interest to be vindicated by plaintiffs with no more at stake ... than a fraction of a vote ... a $5 fine and costs ... and a $1.50 poll tax.... 'The basic idea that comes out in numerous cases is that *an identifiable trifle is enough for standing* to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.'

*United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973) (citations omitted) (emphasis added). Because plaintiff has experienced various injuries, the court finds the necessary standing for him to bring this action.

■ The next issue is whether this action has been rendered moot, because the City leased the water tower's roof to a private entity after the filing of this lawsuit. As the Supreme Court stated in *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980), if an avowed secular purpose is found to be self serving, it may not be "sufficient to avoid conflict with the First Amendment." The leases between the City and Space Coast Industries, Inc., as well as between the City and "The Citizens for Majority Rights" (CMR), were nothing but pretense. They were simply ruses to allow the City to use a private entity to fulfill its goals. The lease between the City and CMR was in default for six months, but the cross was illuminated virtually every night.

At trial, the city attorney admitted that the City's general policy in default cases is to cut off electrical power and send a notice of default. The city attorney also admitted at trial that CMR was required to pay each month for the electricity that lighted the cross. The only bill in evidence that CMR paid was dated August 11, 1989, about one week before the trial.

The lease itself is suspect. According to the lease, either party could terminate the agreement for any reason with sixty days notice. Moreover, the lessee could not remove the cross and replace it with another symbol without the City's written permission. The court concludes, therefore, that this action has not been rendered moot.

■ The final issue is whether the Latin cross atop the publicly owned water tower violates the establishment clause of the first amendment to the United States Constitution. The establishment clause provides in pertinent part that "Congress shall make no laws respecting an establishment of religion...." U.S. Const. amend. I. This prohibition applies to the states through the fourteenth amendment. *See, e.g., Wallace v. Jaffree,* 472 U.S. 38, 48–49, 105 S.Ct. 2479, 2485–86, 86 L.Ed.2d 29 (1985); *School Dist. of Abington Twsp. v. Schempp,* 374 U.S. 203, 215–16, 83 S.Ct. 1560, 1567–68, 10 L.Ed.2d 844 (1963). In interpreting the establishment clause, the Supreme Court has identified three tests to determine whether governmental action complies with the clause: (1) whether the action has a secular purpose; (2) whether the "principal or primary effect" is "one that neither advances nor inhibits religion"; and (3) whether the action fosters " 'an excessive government entanglement with religion.' " *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971) (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)). If one of these three elements is violated, the establishment clause will preclude the challenged governmental action. *See, e.g., Stone,* 449 U.S. at 40–41, 101 S.Ct. at 193–94. As the following analysis will demonstrate, the Latin cross atop the St. Cloud water tower violates each of the *Lemon* test's three prongs.

First, whether the governmental action has a secular purpose. The purpose requirement of the *Lemon* analysis "aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). "When a government permits religious symbols to be constructed on public property, its ability to articulate a secular purpose becomes the crucial focus under the Establishment Clause." *Rabun County,* 698 F.2d at 1110.

The Latin cross is unmistakably a universal symbol of Christianity. Each witness at trial, including a Catholic Priest and a Jewish Rabbi, testified that they could perceive of no secular purpose for a Latin cross. Such a cross has always been a symbol of Christianity, and it has never had any secular purpose. In fact, no federal case has ever found the display of a Latin cross on public land by a state or state subdivision to be constitutional. *See, e.g., American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265 (7th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Friedman v. Board of County Comm'rs,* 781 F.2d 777 (10th Cir. 1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *American Civil Liberties Union v. Rabun County Chamber of Commerce,* 698 F.2d 1098 (11th Cir.1983); *Gilfillan v. City of Philadelphia,* 637 F.2d 924 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981); *Libin v. Town of Greenwich,* 625 F.Supp. 393 (D.Conn.1985); *Greater Houston Chapter of ACLU v. Eckels,* 589 F.Supp. 222 (S.D.Tex.1984), *appeal dismissed,* 755 F.2d 426 (1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

As the Supreme Court noted in *County of Allegheny v. American Civil Liberties Union,* —— U.S. ——, 109 S.Ct. 3086, 3101,

106 L.Ed.2d 472 (1989): "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984)). Moreover, whether the source of the funds used to construct or maintain such symbols is public or private is not the decisive factor; instead, the focus of the establishment clause is on the state's support of a particular activity. *See, e.g., Stone*, 449 U.S. at 42, 101 S.Ct. at 194; *Rabun County*, 698 F.2d at 1110 n. 22.

The City has no signs on or around the water tower to advise people that the cross is privately owned and that the City neither supports nor disfavors the religious doctrine depicted by the cross. Apart from the City seal, the only other visible sign on the tower reads, "Welcome to St. Cloud." The sign's language gives the appearance that the City supports the religious doctrine of the cross, which is Christianity. Because the cross is atop the tower year round without accompanying secular symbols or disclaimers that would announce to the public that the City is disinterested in religious features, the City's purpose behind placing the cross on the tower could not be secular. *See Burelle v. City of Nashua*, 599 F.Supp. 792, 796–97 (D.N.H. 1984).

Defendants contend, however, that the cross has secular and historical value as a guidepost for fishermen and pilots and as a landmark. Even if the court found the City's purpose to be truly secular, a government may not "employ religious means to reach a secular goal unless secular means are wholly unavailing." *Schempp*, 374 U.S. at 294, 83 S.Ct. at 1609 (Brennan, J., concurring); *Rabun County*, 698 F.2d at 1111. Secular means are availing here. At trial, fishermen and pilots admitted that another lighted symbol of equal size could adequately serve their needs as a guidepost.

In regard to defendants' argument that the cross has historical value to the community, "history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *County of Allegheny*, 109 S.Ct. at 3106. In addition, defendants' historical argument ignores the fact that "the Constitution mandates that government remain secular, rather than affiliating itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths." *Id*. at 3110. In sum, the court does not find a secular purpose behind defendants' displaying, maintaining, and illuminating the Latin cross on the water tower.

The second prong of the *Lemon* test requires that the perceived governmental practice have the principal or primary effect of neither advancing nor inhibiting religion. An important concern of the second prong is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). Furthermore, "[e]very government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 694, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

Because the City does not have disclaimer signs on or around the tower, the "Welcome to St. Cloud" sign and the City seal on the tower reasonably communicate a message of government endorsement of the Latin cross. The prohibition against government endorsement of religion "'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.'" *County of Allegheny*, 109 S.Ct. at 3101 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985)). When government en-

dorses or appears to endorse one religion over another, it sends a message to the nonadherents of that religion "that they are outsiders, not full members of the political community...." *Lynch,* 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring); it also sends a message to adherents of that religion "that they are insiders, favored members of the political community." *Id.*

Those who observe the cross atop the water tower can only presume that the City of St. Cloud has abandoned any pretense of religious neutrality and has wholeheartedly endorsed the Christian religion. *See Friedman v. Board of County Comm'rs,* 781 F.2d 777, 781 (10th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986); *American Civil Liberties Union v. City of Birmingham,* 588 F.Supp. 1337 (E.D.Mich.1984), *aff'd,* 791 F.2d 1561 (6th Cir.1986), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *Burelle,* 599 F.Supp. at 797. The display of the cross on the water tower, therefore, has the effect of advancing, affirming, approving, or otherwise validating Christianity.

The third prong of the *Lemon* test requires that the perceived governmental practice not foster an excessive governmental entanglement with religion. As other courts have observed, "the source, whether public or private, of the funds used to construct or maintain these symbols is not decisive; rather the focus of the Establishment Clause is on the state's support of a particular activity." *Rabun County,* 698 F.2d at 1110 n. 22 (citing *Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980); *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962)).

The City of St. Cloud is entangled with religion because it funded the illumination of the cross during the six month period when "The Citizens for Majority Rights" was in default of its lease. Even if private persons alone bore the expense of lighting and maintaining the cross, that would "not serve to dispel the aura that the municipal

government ... has excessively entangled itself with a religious doctrine...." *Burelle,* 599 F.Supp. at 797. The establishment clause would still be violated if government property was used to support a particular religion. Defendants' involvement with the cross, therefore, also violates the final prong of the *Lemon* analysis.

In following the Supreme Court's decision in *County of Allegheny,* "once the judgment has been made that a particular proclamation of Christian belief, when disseminated from a particular location of government property, has the effect on demonstrating the government's endorsement of Christian faith, then it necessarily follows that the practice must be enjoined to protect the constitutional rights of those citizens who follow some creed other than Christianity." *County of Allegheny,* 109 S.Ct. at 3111. Accordingly, the court GRANTS an injunction against defendants, enjoining them from displaying, maintaining, illuminating, or otherwise allowing a Latin cross atop the St. Cloud water tower. Defendants have sixty days from the date of this order to comply.

As dicta, and merely as a suggestion to comport with the requirements of the *Lemon* test, the City may maintain a cross as a landmark, if such a cross primarily promotes a secular purpose. The City could maintain a compass rose denoting the four corners of the compass. The compass rose should be accompanied by a secular statement such as "Welcome to St. Cloud, Crossroads to the World," because the City is on one of the primary roads leading to Disney World. If the City's act of recognition or accommodation is passive and symbolic, any intangible benefits to religion will probably not present a realistic risk of establishment.

It is SO ORDERED.