**Rev. William S. SMITH, et al., Plaintiffs,**

v.

**Timothy LINDSTROM, et al., Defendants.**

**Civ. A. No. 87–0068–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

Nov. 9, 1988.

**550**

D. Brock Green, MacQueen, Rosenfield & Green, Charlottesville, Va., for plaintiffs.

George R. St. John, Charlottesville, Va., for defendants.

James J. Knicely, Graber & Knicely, P.C., Williamsburg, Va., Roy W. Ferguson, Harrisonburg, Va., for amicus curiae.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This case is before the court on cross motions for summary judgment by plaintiffs and defendants. The action arises under the establishment clause of the first amendment of the United States Constitution, as applied to the states through the fourteenth amendment. U.S. Const. amend. I; U.S. Const. amend. XIV; *Everson v. Board of Education*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). For the reasons elaborated below, this court grants plaintiffs' motion for summary judgment and finds that in permitting the erection of a nativity scene on the front lawn of the Albemarle County Office Building, defendants violated the Establishment Clause of the first amendment of the United States Constitution.

## I.

Plaintiffs are a group of local citizens, some of whom are ordained clergy. Defendants are the Board of Supervisors of Albemarle County, Virginia.

All pertinent facts in this matter have been stipulated by agreement of both parties. Immediately prior to December 2, 1987, the Charlottesville–Albemarle Jaycees asked the Albemarle County Supervisors (defendants) for permission to place a nativity scene on the front lawn of the County Office Building. At their meeting of December 2, 1987, the defendants, by a vote of four to two, allowed the display of the nativity scene. The front lawn of the County Office Building is a grassy expanse located at one of the busiest intersections in Charlottesville. The County Office Building is a large brick building with "Albemarle County Office Building" prominently displayed on the front of the building clearly above and behind the location of the creche. The American and Virginia flags flank the front of the building and are also in the general line of vision when viewing the creche. The creche consists of large figures, easily visible, and illuminated at night. The creche was erected on December 6, 1987, and remained until January 10, 1988. No other seasonal symbols were present in the display. The erection and maintenance of the creche involved no expenditures of County funds. Immediately after the creche had been erected, an 18" by 6" disclaimer sign reading "Sponsored by Charlottesville Jaycees" was placed next to the creche. After this suit was filed on December 14, 1987, a larger disclaimer sign was placed next to the creche.

This site has been the location of the County Office Building only since 1981. However, since that time, the lawn has been used sporadically for occasional activities: a beauty pageant, a billboard for the United Way, two Easter "sunrise" services, several assorted weddings, municipal band concerts, and a civil rights demonstration.

Despite the fact that this is the office building for Albemarle County, it is located in downtown Charlottesville. It is a highly visible location. Indeed, the president of

the Jaycees testified that he sought to erect the creche in that location because of the site's visibility, although he insisted that the choice of that property was not motivated by the fact that the lawn was situated in front of the County Office Building.

In deciding how the parameters of this situation fit with earlier legal tests for determining violations of the establishment clause, this court takes particular note of the following aspects of the display. First, the creche consists of large figures, readily visible, which are brightly lit at night. Second, the creche was displayed for a five-week period. Finally, and most significantly, the creche was displayed in the context of a government site. That is, one could not readily view the creche without also viewing the trappings and identifying marks of the state. Objectively, the visual association was unmistakable and impossible to sever.

## II.

In determining whether a nativity display or creche violates the establishment clause, this court must follow the controlling law set out in the case of *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The City of Pawtucket, Rhode Island, erected a creche in a park in the downtown shopping district. *Id.* at 671, 104 S.Ct. at 1358. The display contained a variety of seasonal symbols, both thoroughly religious symbols and symbols which had lost their overt religious denotation. The display was owned by the City

and the park itself was owned by a non-profit organization. *Id.*

In the context of deciding this case, the Supreme Court made several observations which form the intellectual background for inquiries into violations of the Establishment Clause and for the application of any specific legal test. First, the Supreme Court recognized that there was a certain tension inevitably present in Establishment Clause cases: "In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible." *Id.* at 672, 104 S.Ct. at 1359. The Supreme Court went on to argue that not only is a literalistic application of the "wall of separation" metaphor impracticable and undesirable, but it is one which does not find favor with the Supreme Court. *Id.* at 678, 104 S.Ct. at 1361. In no small part, the Court argued, the inadequacy of a "bright line" construct, like the inadequacy of the "wall" metaphor, rises out of the pluralism and complexity of contemporary American society. As the Court reasoned, "In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court."[1] *Id.* In addition to noting the inevitable tensions at work in Establishment Clause cases and the need for a non-absolutist way of reading the

---

1. Many who would applaud any Supreme Court move away from the Jeffersonian metaphor of the "wall" between church and state argue that the proper posture is a consistent pattern of expansive (but supposedly) "nonpreferential" aid to religion. This court notes in passing that, at least in reference to the Establishment Clause questions involving displays and possible government endorsement, nonpreferential aid to religion is difficult, if not impossible. The assisted activities or ceremonies publicly celebrate a specific sect, cluster of sects, or a specific religious tradition, as opposed to other religious traditions or sects. Government assistance to religion which would involve the erection of displays celebrating a specific sect or group of sects may be nonpreferential in that

any sect could make use of this platform, but it is surely not nonpreferential in that it celebrates, or assists in the celebration of, a particular sect rather than in the celebration of some generic concept of "religion" without its particular sectarian manifestations.

> For the issues that are most controversial, nonpreferential aid is clearly impossible. No prayer is neutral among all faiths, even if one makes the mistake of excluding atheists and agnostics from consideration.... Government sponsored religious symbols or ceremonies, whether in schools, legislatures, courthouses, or parks, are inherently preferential.

Laycock *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875, 920 (1986).

Establishment Clause which exhibits deference to the pluralism of contemporary American society, the Court also noted the role that religion plays in American life. Indeed, Chief Justice Burger took great care to detail what he termed the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* at 674, 104 S.Ct. at 1360. This recognition of the role of religion in American life provided not merely the historical and intellectual backdrop to the Court's holding in *Lynch,* but was transformed by the Chief Justice from a descriptive datum into a pointed normative tool, a warrant for finding that the creche which was displayed in Pawtucket, Rhode Island did not violate the Establishment Clause of the first amendment.

### A.

The standard test for determining whether the Establishment Clause has been violated was developed in the case of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In *Lynch,* the Supreme Court also utilized the three-prong inquiry developed in *Lemon.*[2] Even as the Supreme Court was applying the three prongs of the *Lemon* test to the Pawtucket creche, it noted its continuing, if episodic, "unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362.

The Supreme Court first looked at the secular purpose prong of the *Lemon* inquiry. The Court found that

> The display is sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes. The district court's inference, drawn from the religious nature of the creche, that the City

had no secular purpose was, on this record, clearly erroneous.

*Lynch,* 465 U.S. at 681, 104 S.Ct. at 1363 (footnote omitted). The Court ruled that since some secular purposes were clearly at work in the display of the creche this initial prong of the *Lemon* test was satisfied. It need not be shown that the City had exclusively or solely secular purposes in displaying the creche. *Id.* at 681, n. 6, 104 S.Ct. at 1363 n. 6.

The second prong of the Lemon test examines the primary effect of the government action and asks whether the effect of that action is to benefit religion. In *Lynch,* the Supreme Court utilized what has been called a "more than" test. Van Alstyne, *Remarks at the Proceedings of the Forty–Fifth Judicial Conference of the D.C. Circuit,* 105 F.R.D. 251, 421 (1984). That is, the Supreme Court found that this creche was no more beneficial to religion than other programs or activities which had passed muster previously. "We are unable to discern a greater aid to religion deriving from inclusion of the creche than from these benefits and endorsements previously held not violative of the Establishment Clause." *Lynch,* 465 U.S. at 682, 104 S.Ct. at 1364. Furthermore, the Court found that whatever benefit would accrue to a particular sect or religion or to religion in general from the display of this creche was sufficiently "indirect, remote, and incidental" to avoid violation of the second prong of the *Lemon* test. *Id.* at 683, 104 S.Ct. at 1364. The Chief Justice argued that the display in Pawtucket did not constitute any more of an endorsement of religion than governmental proclamations about the holiday of Christmas or the display of paintings with religious themes in museums supported by the government.[3] *Id.*

---

**2.** Under the *Lemon* test, a court inquires "whether the challenged law or conduct had a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." *Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362 (citing *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)).

**3.** Van Alstyne's characterization of this prong of the inquiry as a "more than" test is accurate because in applying this prong of *Lemon,* the Chief Justice only ascertained whether the action in question went further than other state actions held to be permissible in the past. However, in utilizing Van Alstyne's characterization of the second prong of the *Lemon* test, this court is not to be understood as adopting the criticism

The final prong on the *Lemon* test is the inquiry into whether the action in question fosters " 'an excessive government entanglement with religion.' " *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111 (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)). The Supreme Court noted that the district court in Rhode Island had correctly found that "there had been no administrative entanglement between religion and state resulting from the city's ownership and use of the creche." *Lynch*, 465 U.S. at 683, 104 S.Ct. at 1364. However, under this third prong of the *Lemon* test, the district court had found that the litigation in Rhode Island had resulted in "political divisiveness" and that this divisiveness coupled with the allegedly impermissible purpose and effect found by the district court resulted in "excessive entanglement." *Id.* at 683, 104 S.Ct. at 1364. While agreeing with the district court about the lack of administrative entanglement, the Supreme Court concluded that the First Circuit Court of Appeals had been correct in observing that political divisiveness alone was not sufficient in this case to strike down a state action which is otherwise constitutionally acceptable. *Id.* at 684, 104 S.Ct. at 1365. The Supreme Court seemed to restrict the inquiry regarding political divisiveness to those cases involving subsidies to schools, colleges, or other religious institutions. *Id.*

Therefore, the Supreme Court concluded, "We hold that, notwithstanding the religious significance of the creche, the City of Pawtucket has not violated the Establishment Clause of the first amendment." *Id.*

at 687, 104 S.Ct. at 1366. In so holding, the Court noted that even though "the creche is identified with one religious faith," *id.* at 685, 104 S.Ct. at 1365, the display of the Pawtucket creche met objectives which essentially satisfied the *Lemon* test. One commentator has characterized those objectives in this way:

> [F]irst, the creche served the purpose of ' "respect[ing] the religious nature of our people" ' by making public institutions receptive to religious expression. Second, when viewed in the context of the Christmas holiday celebration, the display—depicting the religious and cultural origins of the holiday—could be viewed as part of the nation's cultural heritage, and thus a worthy object of government recognition. Finally, the creche has the secular purpose of instilling 'friendly community spirit of good will in keeping with the season.'

*Developments in the Law: Religion and the State*, 100 Harv.L.Rev. 1606, 1656 (1987) (footnotes omitted).

In line with the Court's observation that the problems presented by these Establishment Clause cases cannot be handled in a "absolutist" manner, the majority emphasized the particularistic nature of the inquiry in a case such as this.

> In each case, the inquiry calls for linedrawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause 'was to state an objective, not to write a statute.'

of *Lynch* which Van Alstyne draws out of his characterization. Van Alstyne points to an alleged irony in the "more than" test when he argues that it functions not as the ceiling or limit on the interaction which government will have with religion but rather as a conduit leading to increased entanglement of church and state. Van Alstyne argues that

> The gradual (but increasingly pervasive) installment of compromised religion within government itself thus draws that which was formerly outside to the inside—the prevailing monotheism has been made a pervasive aspect of state practice, and put to service by the state when felt useful. Additional appropria-

tions from sectarianism may then become logically fitted as part of this 'secular' state: distinctly religious practices, in so far as they serve the state, thus by definition have virtually succeeded in satisfying a secular purpose and as promoting a secular interest.

105 F.R.D. at 424. This court utilizes Van Alstyne's initial characterization as an illuminating one, but refrains from taking this opportunity to subscribe in the least to the criticism of *Lynch* which Van Alstyne advances. Without question, it is the structure of *Lynch* which must control the deliberations of this court in the matter before it.

*Lynch,* 465 U.S. at 678, 104 S.Ct. at 1362 (quoting *Walz,* 397 U.S. at 668, 90 S.Ct. at 1411). While the Supreme Court has clearly developed a framework which this court is obligated to use in analyzing the matter before it, *Lynch* commands us to examine, in a particularistic manner, the effect of this creche in the context before us. Thus, the extent to which the nativity display in this action differs from or is similar to the display in *Lynch* will be of crucial importance in determining whether there has been an Establishment Clause violation.[4]

Perhaps what will prove to be one of the most far-reaching doctrinal developments to come out of *Lynch* is the conceptual structure which Justice O'Connor applied in her concurring opinion. As previously noted, the majority in *Lynch,* citing the earlier precedent of *Walz v. Tax Commission,* found that "The purpose of the Establishment Clause 'was to state an objective, not to write a statute.'" *Lynch,* 465 U.S. at 678, 104 S.Ct. at 1362 (quoting *Walz,* 397 U.S. at 668, 90 S.Ct. at 1411.) In attempting to elaborate on what this fundamental "objective" of the Establishment Clause might be, Justice O'Connor interprets it to mean that "The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." *Lynch,* 465 U.S. at 687, 104 S.Ct. at 1367 (O'Connor, J., concurring). According to O'Connor's reading of the objective of the Establishment Clause, inclusion for membership within the political community cannot be predicated on the presence or absence of religious affiliation or upon a particular type of religious affiliation.

Justice O'Connor notes that one way in which the Establishment Clause can be violated by government is when the state endorses religion. An endorsement of a religion by the state undercuts the Establishment Clause's purpose in prohibiting government from making membership in the political community a function of religious affiliation. Justice O'Connor goes on to note that "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Id.* at 668, 104 S.Ct. at 1355. Of course, Justice O'Connor does not offer the notion of "endorsement" as an alternative to the *Lemon* test, but rather as a way of sharpening the focus of the inquiry which *Lemon* mandates.[5] When Justice O'Connor analyzed the Pawtucket creche, she concluded, as did the majority, that the display was constitutionally permissible. She found that when the creche was considered in the context of the display and in the context of the shared understanding of the Christmas holiday, "the display celebrates a public holiday, and no one contends that declaration of that holiday is understood to be an endorsement of religion." *Id.* at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). Under her analysis, this was a government acknowledgment or recognition of religion and its place in American life, without the taint of government endorsement.[6]

---

**4.** The display in question in *Lynch* contained "many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus House, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS,' and the creche at issue here." *Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358.

**5.** Justice O'Connor argues that "focusing on institutional entanglement and on endorsement or disapproval of religion clarifies the *Lemon* test as an analytical device." *Lynch,* 465 U.S. at 689, 104 S.Ct. at 1367 (O'Connor, J., concurring).

**6.** Justice O'Connor argued that determination of whether or not there has been endorsement is properly a legal determination.

> [W]hether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question of whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.

*Lynch,* 465 U.S. at 693–94, 104 S.Ct. at 1370 (O'Connor, J., concurring).

There is no question but that in examining whether the display of a creche or nativity scene violates the Establishment Clause, the decision in *Lynch* is the controlling law for this court, as for every court in this country. However, since adjudication is not a mere mechanistic or formalistic process and since *Lynch* provides us only with the analytic framework within which to find an answer without giving us the exact answer, further analysis is necessary. In fact, the language of *Lynch* suggests such additional analysis. As noted *supra*, the majority clearly indicated that any judicial inquiry in this area must be a particularistic sort, not the mere reflexive application of a *per se* rule.[7] *Id.* at 678, 104 S.Ct. at 1361. In the spirit of the inquiry mandated by *Lynch*, this court is compelled to note that the facts of the case before it differ markedly from those in *Lynch*. In *Lynch*, the display incorporated virtually the universe of possible Christmas symbols, both robustly religious and markedly less so, and displayed them on a site owned by a non-profit group and used as a park. In the instant case, the display consists only of the religious nativity scene and it was located on public land at the very front of the County Office Building with the trappings of government providing the unavoidable and obvious backdrop to the display.

## B.

Since *Lynch*, while undoubtedly legally controlling, is also factually dissimilar to the instant case, this court finds it useful to look at persuasive precedents from courts which have applied the holding of *Lynch* to other nativity displays.

In 1986, the Sixth Circuit Court of Appeals found that a city-owned creche displayed on the front lawn of the City Hall of Birmingham, Michigan, violated the Establishment Clause of the first amendment. *American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561 (6th Cir.1986), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93

L.Ed.2d 371 (1986). The display in question consisted solely of an unaccompanied nativity scene, including only the traditional religious creche figures. *Id.* at 1562. The creche in this case had been built and was maintained with public funds. *Id.* It was displayed prominently on the lawn in front of the Birmingham City Hall. The Sixth Circuit applied the *Lemon* test, as refined in *Lynch*, and found that the effect prong was violated. *Id.* at 1567. The court held,

> When surrounded by multitude of secular symbols of Christmas, a nativity scene may do no more than remind an observer that the holiday has a religious origin. But when the nonreligious trappings—accretions of the centuries—are stripped away, there remains only the universally recognized symbol for the central affirmation of a single religion—Christianity.
>
> .... It is difficult to believe that the city's practice of displaying an unadorned creche on the city hall would not convey to the non-Christian a message that the city endorses Christianity.

*Id.* at 1566. The Court of Appeals identified three salient aspects of this creche display which rendered it constitutionally infirm: the use of public funds in connection with the display, the location of the display in front of the City Hall, and the fact that it was the display of a nativity scene alone, unadorned with any secularized seasonal symbols. The first of these factors, the use of public funds, is the only characteristic not shared by the display in the case before this court and it is this characteristic which is arguably the least important to the result in the Birmingham case. While the Sixth Circuit refers to the display as a "city-owned and city-sponsored nativity scene," *id.* at 1567, when they analyzed why this display violated the second prong of the *Lemon* test, the Sixth Circuit focused on both the undiluted religiosity of the display and its location on the lawn in front of the City Hall. *Id.* at 1566. The

---

7. It is interesting to note in this connection that Justice O'Connor, in her concurring opinion, also calls for this sort of particularistic inquiry. "Every governmental practice must be judged in its unique circumstances to determine whether it constitutes a endorsement or disapproval of religion." *Lynch*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring).

Sixth Circuit relied primarily on the unaccompanied nature of the Birmingham nativity display in order to distinguish that case from *Lynch.*

In *American Jewish Congress v. The City of Chicago,* 827 F.2d 120 (7th Cir. 1987), the Court of Appeals for the Seventh Circuit, reversing an unpublished decision by a district court, distinguished the case from *Lynch* because of the location of the creche display. The Court of Appeals found a violation of the effect prong of the *Lemon* test. *Id.* at 127–28. The display consisted of the traditional nativity figures with tree branches behind the scene and some holiday lights strung on those branches for illumination. The Seventh Circuit first took care to distinguish the case before it from *Lynch* on the grounds that "the nativity scene was self-contained, rather than one element of a larger display." *Id.* at 125. Although there were other seasonal symbols and paraphernalia in the vague general vicinity, these other items "cannot reasonably be said to have been part of the 'display.'" *Id.* While the nature of the display was one of the factors which led the Seventh Circuit to distinguish *Lynch* from the case before it, the crucial factor may well have been the location of the creche. The court found that

> Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses Christianity.

> The message of endorsement is equally powerful on the symbolic level. Like the nativity scene itself, City Hall is a symbol—a symbol of government power. The very phrase "City Hall" is commonly used as a metaphor for government. A creche in City Hall thus brings together Church and State in a manner that unmistakenly suggests their alliance. The display at issue in this case advanced religion by sending a message to the people of Chicago that the City approved of Christianity.

*Id.* at 128. It is important to note that in the case before the Seventh Circuit, as in the case before this court, disclaimer signs were placed next to the display. In *City of Chicago,* six signs, each approximately seven by ten inches were placed around the display, the signs reading "Donated by the Chicago Plasterer's Institute—this exhibit is neither sponsored nor endorsed by the Government of the City of Chicago." *Id.* at 123. However, the Court of Appeals held that the attempt to mitigate the effect of City endorsement of a particular religion was unsuccessful, concluding that "[T]he message of government endorsement generated by this display is too pervasive to be mitigated by the presence of disclaimer. As the district court correctly noted, 'a disclaimer of the obvious is of no significant effect.'" *Id.* at 128 (quoting *American Jewish Congress v. Congress,* No. 85–C–9471 at 14 (N.D.Ill. Dec. 12, 1986) [available on WESTLAW, 1986 WL 14648] (LEXIS, Genfed library, Dist File)).

The Third Circuit Court of Appeals has recently ruled that a display of religious symbols, in a context quite similar to that in the case before this court, violated the Establishment Clause. *American Civil Liberties Union v. County of Allegheny,* 842 F.2d 655 (3d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988). In *Allegheny County,* the County had permitted the erection of a nativity display inside the main entrance to the County Courthouse and the City of Pittsburgh granted permission for the erection of a menorah on the steps to the main entrance of the building used jointly by the County and the City. *Id.* at 656. The nativity display consists of the traditional creche figures, is owned by a religious group, and is accompanied by a disclaimer sign reading "This display is donated by the Holy Name Society." *Id.* at 657. Display of the creche involved a minimal expenditure of public funds and was displayed for approximately six weeks. *Id.* The menorah is displayed at a joint City–County office building approximately one block from the Courthouse. *Id.* The eigh-

teen foot high menorah is displayed during the celebration of Hanukkah. *Id.* The Court of Appeals in *Allegheny County* saw the second prong of the *Lemon* test as the key to the issue. *Id.* at 661. It found minimal entanglement between city and state and noted that "A public entity usually is able to articulate some secular purpose for a display." *Id.* at 661–62. However, the Court of Appeals concluded that

On the other hand the use of a religious symbol in a display on public property or by a public entity may well be deemed an endorsement of religion regardless of an entity's stated reasons for its placement and thereby implicate the second *Lemon* prong as the impact of the display must be judged objectively.

*Id.* at 662.

Once again, the Court of Appeals was focusing on the location (and the context and meaning invoked by that location) of a display of religious symbols in order to assess the presence of government endorsement. The Third Circuit then went on to identify a group of variables which "a court should consider in determining whether a display has the effect of advancing or endorsing religion." *Id.* at 662. The six variables include inquiries into the location of the display (and the denotations of that location), whether the religious symbols are accompanied by other symbols, and whether there are signs disclaiming the public sponsorship of the display.[8] *Id.* at 662. Treating those variables as the indicia of whether impermissible government endorsement of religion was present, thus triggering a violation of the second prong of the *Lemon* test, the Third Circuit Court of Appeals reversed an unpublished opinion by a district court and found that there was indeed a violation of the Establishment Clause. *Id.* at 663. The court based its holding on the finding that

Each display was located at or in a public building devoted to core functions of

government and each was placed in a prominent site at the public building where visitors would see it. Further, while the menorah was placed near a Christmas tree, neither the creche nor the menorah can reasonably be deemed as subsumed by a larger display of non-religious items. In addition, both the creche and the menorah are associated with religious holidays that would be viewed as pertaining to a particular religion.... Overall, when the record is evaluated in light of these considerations, the only reasonable conclusion is that by permitting the creche and the memorah to be placed at the buildings the city and county have tacitly endorsed Christianity and Judaism and have therefore acted to advance religion.

*Id.* at 662. The court noted in reaching this finding that its result would have been the same if only either the menorah or the creche been displayed, *Id.* at 662 n. 1, and, further, that the use of the disclaimer sign was not efficacious in attempting to dilute or mask the endorsement effect. *Id.* at 662. As noted *supra,* the majority in *Lynch* analogized the Pawtucket creche display to the presence of religious art in publicly sponsored museums. The Third Circuit took care to note that the displays in the case before it did not have a primary effect of edification or pedagogy. They concluded that

Nor are we concerned with the use of religious objects in a museum or as educational instruments in a classroom, in which circumstances the objects could be presented neutrally.... Here, however, the effect was different as it is evident that the religious displays of the City and County have the effect of endorsing the messages reflected by the displays. This is unconstitutional.

*Id.* at 663.[9]

This court has noted the recent grant of a writ of *certiorari* in the *Allegheny*

---

8. The other variables are "the religious intensity of the display," if the display is shown as part of a secularized celebration or holiday, and "the degree of public participation in the ownership and maintenance of the display." *Allegheny County,* 842 F.2d at 662.

9. Thus, the displays in *Allegheny County* could not be defended under the sort of pedagogical exception doctrine outlined by the Supreme Court in *Abington School District v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963) ("Nothing we have said here

*County* case, perhaps indicating a willingness to reconsider some parts or all of the reasoning of *Lynch,* as the Third Circuit applied that reasoning to the *Allegheny County* case. However, speculation as to the meaning of the grant of *certiorari* in the *Allegheny County* case is not only fruitless, but contravenes the principle that this court must decide this case on the law as it now perceives the law to be.

### III.

In applying the controlling framework of *Lynch* to the case at hand and guided by the persuasive precedents cited above, this court finds that the Jaycees' creche displayed on the County Office Building grounds passes the first and third prongs of the *Lemon* test without a great deal of difficulty.

With reference to the third prong of the *Lemon* test, entanglement, this court finds that the display in the matter before it raises even less of a danger of entanglement than did the display in *Lynch.* Whatever possible threat of entanglement might exist in this case, it surely falls far short of the "comprehensive, discriminating, and continuing state surveillance" or "enduring entanglement" described in *Lemon.* 403 U.S. at 619–22, 91 S.Ct. at 2114–16.

■ In turning to the first prong of the *Lemon* test, this court finds that while the evidence regarding the purpose behind the display is not wholly unequivocal, it does not establish, as apparently required by *Lynch,* that a violation of this prong of the *Lemon* test would require demonstrating that no secular purpose at all could be advanced for the display. 465 U.S. at 681 n. 6, 104 S.Ct. at 1363 n. 6. The president of the Charlottesville–Albemarle Jaycees testified that "these practical considerations [visibility, prominence of the display area, and accessibility to electrical outlets], and not the fact that the location houses the Albemarle County Office Building, motivated the chapter's request that it be able to erect a nativity scene on county property." Stipulations of Fact A–7(b). While

the request of the Jaycees cannot be considered "state action," examination of their motivations is useful for the purpose inquiry insofar as it sheds light on the purpose which motivated the defendants and to the extent that the purposes articulated by the Jaycees were, in turn, in effect adopted by the County in granting permission.

Although the testimony of the president of the Jaycees was careful only to cite "practical considerations," the actual request made before the Board of Supervisors is somewhat more equivocal in its overtones. In requesting the County's permission, a representative of the Jaycees stated that

> I feel that by granting us permission, the Board would be giving its local approval towards more Christmas spirit and raising the hopes of the members of our community to be involved. It's a very visible area in town. I dare say that the majority of our residents do pass by it at least one time during the week ... There are a number of open lots that may be less political or controversial to locate the nativity scene. But they do not provide the exposure or the access to electricity for us to illuminate it so that it could be viewed both day and night.

Stipulations of Fact, A–8.

Reading the purposes of the Jaycees as being, to some degree, reflective of the purposes of the defendants, and comparing those against the purposes which the *Lynch* decision held to be legitimate, the court finds that defendants can articulate a secular purpose. In *Lynch,* the acceptable secular purpose of the display was "to celebrate the Holiday and to depict the origins of that Holiday." *Lynch,* 465 U.S. at 681, 104 S.Ct. at 1363. This court finds it quite reasonable to read the motivations of the Jaycees as expressing, however inchoately, a "secular purpose," as that term is defined in *Lynch.* This court can vindicate the County on the first prong of the *Lemon* test because it is fair to impute to

indicates that such study of the Bible or of religion, when presented objectively as part of a

secular program of education, may not be effected consistently with the First Amendment.")

defendants the purposes implicit in the motivations of the Jaycees. It is fair to do so because the defendants, not only by vote, but by the terms of the debate, explicitly adopted those motivations as its purposes and seek, by their action, to support those purposes.[10]

### A.

It is the second prong of the *Lemon* test which is ultimately fatal to the creche display by the County. As the Third Circuit noted in *Allegheny County*, it is often the second prong which will prove to be the troublesome inquiry in a state action which violates the Establishment Clause. 842 F.2d at 661. This is because it is usually possible so to structure the state action as to minimize, if not avoid, entanglement between church and state. *Id.* at 662. Furthermore, reasonably skillful actors seemingly need never be tripped up by the purpose inquiry, since the Supreme Court in *Lynch* has allowed even a virtual shard of a secular purpose to vindicate state action on that prong of the *Lemon* test. *Lynch*, 465 U.S. at 681 n. 6, 104 S.Ct. at 1363 n. 6. Thus, anything short of a pretextual purpose will insulate state action from an Establishment Clause violation based on that prong of the *Lemon* test.[11]

In determining whether the display of the creche on the County Office lawn violated the effect prong of the *Lemon* test, this court "asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). This court is fully aware that the rubric of "endorsement" was developed first within the context of a concurring opinion, and not as the majority opinion in *Lynch*. However, this court believes that it is legitimate to utilize Justice O'Connor's rubric in pursuing its inquiry into the second prong of the *Lemon* test.

First, it is important to remember that while her conceptual framework was not developed as a part of the majority opinion, it was developed within the context of an opinion concurring with the majority.[12] Second, the Supreme Court itself has utilized the endorsement inquiry as an analytical tool. In *Wallace v. Jaffree*, the Court indicated that it was using the concept of endorsement in attempting to ascertain whether a "moment of silence" law violated the Establishment Clause. 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985). While the state action in question in *Wallace* was disallowed because it was held to violate the purpose prong of the *Lemon* test, the invocation of the rubric of endorsement by the Court suggested that the majority found O'Connor's "clarification" to be a useful analytical tool.[13] The Court also used the rubric of endorsement in the case of *Grand Rapids School District v. Ball* when it stated:

> Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to incul-

---

10. *See, e.g.,* Statements of the defendants endorsing the motivations of the Jaycees. Statements of Supervisors Cooke, Way, and Bowie, Stipulations of Fact, A–10, A–11, A–12.

11. It appears that it is necessary for a court to discover the proverbial "smoking gun"—a virtually proselytising purpose—behind the creation of a state program in order for that program to fail the purpose inquiry. *See, e.g., Wallace v. Jaffree*, 472 U.S. 38, 57, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985) ("The State did not present evidence of *any* secular purpose.") (emphasis in original).

12. Justice O'Connor indicated in her concurring opinion that she wrote "to suggest a clarification of our Establishment Clause doctrine" and goes on to assert that "the Court's opinion, as I read it, is consistent with my analysis." *Lynch*, 465 U.S. at 687, 104 S.Ct. at 1366–67. (O'Connor, J., concurring). It is fair to conclude that Justice O'Connor saw herself as only clarifying Establishment Clause doctrine, simply sharpening the analytical tools and helping more tightly to focus the appropriate inquiry. "Focusing on institutional entanglement and on endorsement or disapproval of religion clarifies the *Lemon* test as an analytical device." *Id.* at 689, 104 S.Ct. at 1367. (O'Connor, J., concurring).

13. Concurring with the judgment of the majority in *Wallace v. Jaffree*, Justice O'Connor has elaborated further on the concept of endorsement. 472 U.S. at 69–70, 105 S.Ct. at 2496–97. (O'Connor, J., concurring).

cate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated.

473 U.S. 373, 389, 105 S.Ct. 3216, 3225, 87 L.Ed.2d 267 (1985).

Furthermore, this court is more readily inclined to adopt the test of endorsement because a number of other courts, in particular Courts of Appeal, have also utilized the analytical device first developed by Justice O'Connor. *See Allegheny County,* 842 F.2d at 662; *City of Chicago,* 827 F.2d at 127; *City of Birmingham,* 791 F.2d at 1563. Finally, this court readily uses Justice O'Connor's analytical device because we find it to be an extraordinarily useful, adaptable, and even illuminating analytical device.[14]

■ Endorsement by the state apparatus of a sect or a religious ideology strikes at the very heart of the guarantees of the Establishment Clause because such endorsement provides a very real threat of the symbolic disenfranchisement of a portion of the community. As Justice O'Connor herself elaborated, "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch,* 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). Endorsement of a sect by the government tells those citizens not embraced by the sect

that they are either not fully members of the political community or else that their status as full members may somehow be in jeopardy. In order to have an understanding of religious liberty which is at all robust and vital, it is essential to read the Establishment Clause as "forbidding official actions that signify official endorsement or exclusion based on an individual's religious beliefs." L. Tribe, *American Constitutional Law,* 1187–88 (1988). In criticizing a bill before the General Assembly of Virginia, James Madison argued that the establishment which would result from that bill "degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority." *Memorial and Remonstrance Against Religious Assessments,* (reprinted in *Everson,* 330 U.S. at 69, 67 S.Ct. at 537). For Madison, one of the evil effects of the establishment of religion would be to degrade the status of some members of the political community.

Madison's observation is wholly consonant with the perception that led Justice O'Connor to fashion the notion of endorsement. When a government endorses a sect or a religious ideology, it literally "alienates" (i.e., turns into "aliens") members of the *res publica* who are not members of that sect or subscribers to that religious ideology. The upshot of endorsement is that those citizens whose preferences are not endorsed may perceive themselves to be recipients of something akin to a "badge of inferiority."[15] *Plessy v. Ferguson,* 163

---

14. A number of commentators have also lauded Justice O'Connor's endorsement concept as a useful doctrinal development. *See, e.g.,* Loewy, *Rethinking Government Neutrality Toward Religion Under the Establishment Clause: The Untapped Potential of Justice O'Connor's Insight,* 64 N.C.L. Rev. 1049, 1051 (1986) ("Besides giving a more precise focus to the purpose and effect prongs of the *Lemon* test, O'Connor's insight emphasizes that government cannot convey a message that anyone is inferior or superior because of his or her religion."). *See also,* Karst, *Paths to Belonging: The Constitution and Cultural Identity,* 64 N.C. L.Rev. 303, 358 (1986); Tribe, *Seven Deadly Sins of Straining the Constitution Through a Pseudo–Scientific Sieve,* 36 Hastings L.J. 155, 162 (1984).

15. Obviously, the "badge" spoken of in *Plessy v. Ferguson,* 163 U.S. 537, 551, 16 S.Ct. 1138, 1143 (1896), was an indelible badge and the distinction between the insiders and outsiders of the political community after a government endorsement of a religion need not involve such a visible badge or mark of discrimination, although it could if the state violated the Establishment Clause by illegitimately requiring public participation in a given action.

One other difference with the majority opinion in *Plessy*—the opinion which coined the term "badge of inferiority"—is also readily apparent. That opinion perversely concluded that if blacks believed that "the enforced separation of the two races stamps the colored race with a badge of inferiority," it was "solely because the colored race chooses to put that construction

U.S. 537, 551, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896). Endorsement raises the question of religious adherence in a constitutionally inappropriate way. As Justice O'Connor observed,

What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion. It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community.

*Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring).

The message of exclusion which government endorsement sends is one which strikes at the heart of a guarantee of religious liberty contained within the original provisions of the United States Constitution itself. Clause 3 of article 6 establishes that "No religious test shall ever be required as a qualification to any office or public trust under the United States." U.S. Const. art. VI cl. 3. Surely, the object of that provision is to keep participation in the political community from being narrowed on the basis of religious adherence. The upshot of Justice O'Connor's analysis is to suggest that such a bulwark against illegitimate exclusion from participation in the life of the political community is also an object of the Establishment Clause. Both this provision of article VI and the no-endorsement understanding of the Establishment Clause are statements about the composition of the American political community, the security of each citizen's status within that community, and their eligibility to participate in that community. There

are some constitutionally defensible and morally legitimate grounds for creating criteria, such as age, for certain sorts of participation in the political community. However, obeisance to a state approved or endorsed religious ideology cannot be a legitimate criterion or litmus test for inclusion in the political community.[16] Thus, the problematic effect of endorsement is the creation of a defacto establishment through a "symbolic union of church and state." *Grand Rapids School District,* 473 U.S. at 390, 105 S.Ct. at 3226.

### B.

■ This court finds that the creche displayed by defendants had "the effect of communicating a message of government endorsement." *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). In significant ways, the display of the creche in the matter before us differs from the display in *Lynch.* In *Lynch* the nativity scenes was displayed in a setting which was more "neutral" than the lawn of the County Office Building. The setting was a stage without the prominence of governmental buildings and their trappings. The clear symbolic embrace of government found in the matter before us was lacking. It is that symbolic embrace which this court finds to constitute endorsement of a particular religious ideology. Thus, the location of the instant creche, displayed prominently with an unseverable visual association between the trappings of County government and the religious symbols, created the unmistakable message of endorsement. The symbolic embrace present in this case means that the creche displayed by defendants cannot be analogised to a

---

upon it." *Id.* As Justice O'Connor has insightfully noted in her development of the concept of endorsement, the message of exclusion which endorsement carries is a phenomenon which has actual external existence, and is not merely the fevered perception of the aggrieved party. *Lynch,* 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). This court is concerned not to give inadvertently the impression that either the defendants or the Jaycees intended to impose a badge of exclusion. Indeed, because they did not seek to do so is why defendants' action did pass the first prong of the *Lemon* test.

**16.** Indeed, this concern is fully consonant with the ideal of freedom of conscience and intellect which lies at the center of our polity. As Justice Robert Jackson observed in one of the more vital statements of our national political "piety," "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

mere museum display, as the Supreme Court found with the creche in *Lynch.* 465 U.S. at 683, 104 S.Ct. at 1364; *Id.* at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). In part, the message of endorsement arises because of the symbolic embrace created by the location of this creche. This creche is also distinguishable from the display in *Lynch* because the display here contained no other seasonal symbols. This court finds persuasive the reasoning of the District Court in New Hampshire which disallowed the display of a privately owned creche on grounds of the municipal government offices, finding that the effect of that display was "the implicit government support of the religious doctrine represented by the sacred figures therein." *Burelle v. City of Nashua,* 599 F.Supp. 792, 797 (D.N. H.1984). Both the size and the duration of the display serve to tighten the symbolic embrace of the creche by the trappings of government.

It is important to note that this creche, unlike *Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358, but like several others, *Allegheny County,* 842 F.2d at 657; *City of Chicago,* 827 F.2d at 123; *City of Birmingham,* 791 F.2d at 1561; *McCreary v. Stone,* 739 F.2d 716, 718 (2d Cir.1984) *aff'd mem.* by an equally divided court, *sub nom. Board of Trustees v. McCreary,* 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985); *Burelle,* 599 F.Supp. at 793, is privately owned and privately maintained. Certainly, that serves to undercut somewhat the connection between the government and the display. However, that distancing or disengagement between religious display and government presence which is entailed because the creche is privately-owned is minimal in comparison with the strong visual association between church and state produced by the symbolic embrace. As the district court found in *Burelle,* "The fact that public monies are not used for such display does not serve to dispel the aura that the municipal government of Nashua has excessively entangled itself with a reli-

gious doctrine which is not shared by all of its taxpaying citizens." 599 F.Supp. at 797. Despite the fact that this display survives the entanglement inquiry and even though no public funds were necessary to support this creche the "aura" of endorsement is permeating.

In analyzing this creche under the effect prong of the *Lemon* test, one other feature merits mention. A series of disclaimer signs were erected around the creche, at first one quite inconspicuous and then a second disclaimer sign somewhat less inconspicuous. The presence of even this relatively larger disclaimer sign cannot undercut the endorsement that is apparent. The larger disclaimer sign is still rather small and not easily read. Drivers cannot easily read the disclaimer while passing the scene, the intersection is busy, and it is hardly possible to park or to stop and read the disclaimer with the care that would be necessary. Thus, the setting and the potential effect of disclaimers is quite different in this case than in *Allen v. Morton,* where that District of Columbia Circuit Court of Appeals identified the possibility of revised disclaimers as mitigating the threat to the establishment clause. 495 F.2d 65, 90–91 (D.C.Cir.1973). In *Allen,* the display was within a park with ample pedestrian walkways and far more opportunity for those viewing the display to read and assimilate its intended message of dissociation.[17] *Id.* at 78–79.

If the setting in this case been more similar to that described in *Allen,* the result would be the same, for even a readily discernible disclaimer would hardly have been sufficient alone. A larger sign, by itself, would not necessarily begin to undercut the strong aura of government endorsement. As the Seventh Circuit Court of Appeals found in *City of Chicago,* "[T]he message of government endorsement generated by this display was too pervasive to be mitigated by the presence of disclaimers." 827 F.2d at 128.

---

**17.** This is not to suggest that, were there more pedestrian access to and pedestrian traffic past the creche on the front of defendants' lawn accompanied by signs which would attempt more effectively to disclaim government sponsorship of the display, then the display necessarily would have been able to avoid its difficulties under the effect prong of the *Lemon* test.

## C.

Having determined that display of the creche violates the Establishment Clause, this court next turns to an examination of free speech problems which might be presented by disallowing the display. Defendants argue that a County policy which would, in effect, prohibit this religious display would violate the free speech protections also afforded in the first amendment. It is well established that the government may enforce a content-based regulation on speech in a public forum only when the regulation serves a compelling state interest and is narrowly drawn to achieve that end. *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). When the speech in question is religious speech, however, the conflict arises; permitting the speech could violate the Establishment Clause but to disallow speech, even symbolic speech, could entail a content-based regulation, which would require a compelling state interest.

■ As an initial step in this inquiry, it is necessary to identify the type of forum represented by the lawn in front of the County Office Building. The Supreme Court has identified three types of fora: the public forum, the nonpublic forum, and the designated public forum. *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–3448, 87 L.Ed.2d 567 (1985). Traditional public fora are sites such as parks and streets which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). As noted *supra*, there has been some scattered, episodic use of the County Office Building lawn for public activities. However, there is not a long history of the use of this lawn as a forum for free speech activities, especially not under the aegis of its identity as County property. To that extent, its actual history is dissimilar from the history of many of the prime examples of traditional public

fora. However, the inquiry about historical use focuses on the history of a *type* of setting, not the specific setting in question. The site's function—the lawn in front of a seat of government—is similar to other settings judged to be traditional public fora. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (Lafayette Park and Mall); *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (Supreme Court grounds); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed. 2d 284 (1971) (municipal courthouse); *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state capitol grounds).

Whether the lawn can be fairly characterized as a traditional public forum is not dispositive for this analysis because the lawn would certainly also qualify under the rubric of "designated public forum" and the same criteria for the restriction of speech would apply to the designated public forum as to the traditional public forum. *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 ("[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest."). The lawn in question qualifies as a designated public forum, despite relatively little utilization of that forum, because the County had previously developed a "use policy" for the lawn. The classification as a designated public forum is further strengthened by clear evidence in the deliberations of defendants, who believed that in allowing the creche display they were either creating or furthering the classification of the lawn as such a forum.

The Supreme Court has addressed the conflict between free speech and the Establishment Clause, albeit in a somewhat different context, in *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In that case, the University of Missouri at Kansas City had denied permission for a registered student group, an organization of evangelical Christians, to conduct religious meetings or services on school facilities. The university adopted a

regulation prohibiting the use of school buildings and grounds "for purposes of religious worship or religious teaching." *Id.* at 263, 102 S.Ct. at 271. In striking down the regulation, the Supreme Court held that, although the separation of church and state mandated by the Establishment Clause is a compelling state interest, *id.* at 270, 102 S.Ct. at 274, a policy of equal access to a public forum does not offend the Establishment Clause if the policy meets the *Lemon* test. *Id.* In the case of that university, the Court found that the secular purpose and entanglement parts of the *Lemon* test would be met by an open-forum policy. *Id.* at 271–72, 102 S.Ct. at 275–76. The effect prong of the *Lemon* test posed more serious questions, but the Court concluded that an equal access policy would satisfy this element as well. In making this determination, the Court noted that an open forum in a public university "does not confer any *imprimatur* of state approval of religious sects or practices." *Id.* at 274, 102 S.Ct. at 276.

*Widmar* is important to this court's analysis for two reasons. First, it recognizes that complying with constitutional obligations, such as avoiding the establishment of religion, constitutes a compelling state interest. Therefore Albemarle County, along with other governmental units, would have a compelling interest in avoiding violation of the Establishment Clause. Second, the use of public facilities in *Widmar* is quite different from the use of the facilities in the present case. Even the regular use by a religious group of a room in a setting such as a student activities center carries a far different connotation and message than the continuing prominent display of the creche in the matter before us with its tight, symbolic embrace from government. In *Widmar*, there was not the same prominent display of activity,

so that an equal access policy does not convey the same associational message.[18]

In *McCreary v. Stone,* the Second Circuit Court of Appeals faced the issue of the interplay between the Establishment Clause and claims of free expression and exercise. The Second Circuit found that the display of a privately-owned creche in a municipal park did not violate the Establishment Clause. The Second Circuit construed *Lynch* as establishing a sweeping bright line rule that the display of creches does not violate the Establishment Clause. The Second Circuit also dealt with a claim not addressed in *Lynch,* that the equal access rule developed by the Supreme Court in *Widmar v. Vincent* required the display of the creche. The Second Circuit ruled that because of *Lynch,* the equal access rule of *Widmar* controlled on all three prongs of the *Lemon* test, including the primary effect prong:

> "If the *Lynch* creche was not construed as a primary advancement of religion, *a fortiori,* the Village's neutral accommodation herein to permit the display of a creche in a traditional public forum at virtually no expense to it cannot be viewed as a violation of the primary-effect prong of the *Lemon* test and, therefore, violative of the Establishment Clause. As the court noted in *Widmar,* religious benefits derived from the use of an open-access forum are incidental, and the availability of benefits to a broad spectrum of groups is an important index of secular effect."

739 F.2d at 726–27. For two sets of reasons, this court finds that *McCreary* is rather less helpful as persuasive precedent than are the other cases discussed *supra.* First, there are significant factual differences between the nativity display in *McCreary* and the instant display. In *McCreary,* the display did not take place within the context of the trappings of

---

**18.** It does not follow that all the activities covered under a policy like that in *Widmar* must be held *in camera.* The point is rather that the interaction between the setting and the type of display created the message of endorsement in the matter before this court. One of the factors in the display which worked to create that message was the symbolic nature of the speech of the creche, a factor which will be addressed *infra.* In a situation like *Widmar,* there is the expectation of the use of university facilities by a range of different groups, so that the mere presence of a group in such a context will not, *ceteris paribus,* convey the message of state *imprimatur* or endorsement.

government, it was displayed for a much shorter period of time, and the display itself was much smaller. *Id.* at 720, 721. Second, the *McCreary* court handles the precedents of *Lynch* and *Widmar* in a way that this court does not find to be persuasive. *McCreary* treats lightly the factual specificity that *Lynch* echoed throughout the majority opinion, Justice O'Connor's concurring opinion, and the dissenting opinion by Justice Brennan. *Lynch,* 465 U.S. at 678; at 694, 104 S.Ct. at 1361; at 1370 (O'Connor, J., concurring); at 695, 104 S.Ct. at 1371 (Brennan, J., dissenting).

For purposes of this case the Second Circuit opinion gives less weight than appropriate here to the fact-based limitations of *Lynch* and saw *Lynch* as standing for the broad, unadorned, general principal that creche displays do not violate the effect prong of the *Lemon* test, 739 F.2d at 726–27, even though it sought to hand down a narrow ruling. Id. at 730. Second, the court in *McCreary* saw the Supreme Court's finding in *Widmar* as meaning that the open forum in a public university does not confer any *imprimatur* of state approval on religious sects or practices. *Widmar,* 454 U.S. at 274, 102 S.Ct. at 276. The Second Circuit in *McCreary* apparently made the implicit finding that in the context of a public forum, the free speech clause will in most cases "trump" the Establishment Clause. *Widmar,* though hardly unequivocal, indicates that the conclusion of *McCreary* is not compelled. The Supreme Court stated in *Widmar* that the separation of church and state mandated by the Establishment Clause is a compelling state interest. *Id.* at 271, 102 S.Ct. at 275.

Access to rooms in student activity buildings or classrooms and their use for religious meetings carry different connotations from the display of the creche on the lawn in front of the County Office Building. In *Widmar,* the message of endorsement was absent but here it is present. What does or does not seem like endorsement will depend in large measure upon the expectations related to the context within which the speech takes place. With a setting like *Widmar,* such as a student activity center or other open fora in a college setting, there is a clear expectation that various groups will use the facilities. Here the display took place at the symbolic center of government. In *Widmar,* the Supreme Court found that no *imprimatur* of state approval would be transmitted through an open access policy in that case. But here, because of the nature, size, location, and duration of the display, and its relation to the symbolic center of government, the appearance of a government *imprimatur* upon a certain religious ideology is present.

■ This court finds that, given the message of endorsement which is communicated by the relationship between the trappings of government and the creche with its religious connotations, no less restrictive alternative than removal of the creche would curtail the impermissible message of government endorsement. The impotence of the disclaimers attached to the creche only reinforces this conclusion. Therefore, this court's decision meets the criteria recognized in *Widmar* for curtailing speech. 454 U.S. at 270, 102 S.Ct. at 274. This court cannot perceive a more narrowly-drawn regulation which would permit the placement of that creche on that lawn and still avoid a violation of the Establishment Clause.

## IV.

This court has not reached its holding, that the creche in question violates the Establishment Clause, lightly or without a strong sense of concern. In large measure, this is a difficult decision not because of some factual or analytical impediment, but because this court has no wish unnecessarily to interfere with or detract from the celebration of a holiday which is obviously significant on a personal, religious, and financial level to such a large segment of the population. Indeed, as Justice Brennan observed in his dissent to *Lynch,* "After reviewing the Court's opinion, I am convinced that this case appears hard not because the principles of decision are obscure, but because the Christmas holiday seems so familiar and agreeable." *Lynch,*

465 U.S. at 696, 104 S.Ct. at 1371 (Brennan, J., dissenting).

The very familiarity of the Christmas season makes the endorsement harder to detect and the agreeability of the Christmas season may well make observers want either to prefer to avoid seeing the appearance of endorsement or to deny the existence of the endorsement. In the context of a holiday which so many people find agreeable and so familiar, there is a very strong desire on the part of many to avoid seeing what is a constitutional irregularity. This desire may be especially strong in the present case when this court finds that, in addition to acceptable secular purposes behind the government action, the display of the creche was born out of genuine good intentions. However, the intentions of defendants, even though well meant, cannot blind us to the constitutionally impermissible and far less salutary affect of defendants' action. It is well to remember the note of caution of Justice Brandeis to the effect that citizens need to be even more aware of possible deleterious effects of government actions when government intentions are admittedly benign. He observed that

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well-meaning but without understanding.

*Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572–73, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

In that context, of course, Brandeis was referring to violations of the fourth and fifth amendments by the government in pursuit of the laudable objective of law enforcement. But Brandeis' worry about the lack of citizen wakefulness in detecting the harmful effects of seemingly beneficent actions by the government suggests that the same kind of caution is appropriate here. As noted, many of those placing creches, both here and at other sites, are certainly well meaning. However, in the case of those creches impermissibly placed, their sponsors do not see the message of endorsement which is the effect of their action. As benign or even as beneficent as the motives may be, our interests protected by the Establishment Clause are appreciably damaged by the investiture of a potent religious symbol with the secular, civic sanctification of government trappings.

The agreeability of the holiday which tends to blind observers toward violations of the Establishment Clause and the harmful effects of those violations, only serve to make this court take more seriously Justice O'Connor's warning that "Government practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny." *Lynch*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring).

### A.

The association of a nativity display and the trappings of government which result in the message of endorsement is complicated by the fact that the speech in question is symbolic speech. Analyzing the import of symbolic speech is a trickier inquiry than that of verbal speech. Of course, there is no question about the importance and value of symbolic speech, or that it is protected speech. *See, e.g., Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed. 2d 284 (1971). Symbolic speech clearly can be both vivid and volatile, but it is often less precise than verbal speech and, thus, perhaps more prone to effects such as unintended endorsement. In large measure, this is because the meaning of symbolic speech is so closely tied up with its context. F. Schauer, *Free Speech: A Philosophical Inquiry*, 97–98 (1982). In *Lynch*, the import and effect of the creche were clearly functions of its context. In the case before us, the meaning of the creche and, thus, the message of endorsement which it conveys, are governed by a context including prominent symbols of government on the front lawn of the government building.

Although the Court in *Lynch* referred to the creche as a "passive symbol," 465 U.S. at 686, 104 S.Ct. at 1366, the effect of well-crafted symbolic speech is anything but passive, quiet, or ineffective. As Justice Jackson noted in *Board of Education v. Barnette*, "Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality is a shortcut from mind to mind."[19] 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943). The fact that symbolic speech is a "shortcut from mind to mind" means that well-crafted symbolic speech is vivid, but the "shortcut" also means that the effect of the speech may be quite different from the speaker's intent or purpose, viz., the instant defendants had no discernible intent or purpose to send a message of endorsement by permitting the display of the creche, but the effect of the symbolic speech was to send such a message of endorsement nevertheless.

When advising courts to scrutinize carefully the actions of government which acknowledge or celebrate religious events, Justice O'Connor noted that "In making that determination [of an endorsement or disapproval of religion], courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the *myriad, subtle* ways in which Establishment Clause values can be eroded." *Lynch*, 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring) (emphasis added). Since Establishment Clause values can be undercut in ways which are both myriad and subtle and since these potential threats to Establishment Clause values can come in the form of symbolic speech, the danger of a failure to detect a particular message of endorsement is quite real. There is a danger of a dominant culture seeking endorsement of its own sectarian symbols and not seeing that its symbols are sectarian or that they are perceived by those not in that sectarian constituency as instruments of exclusion.[20]

While nonadherents may feel exclusion when the government endorses a particular religious affiliation or ideology, if the adherents of that affiliation or ideology are safely enough ensconced in the dominant cultural motifs, those adherents may be oblivious to the effect of the state's action and may not even recognize, on first reading, the impact of what they are doing. As one commentator has observed,

A government action permitting some religious practices within public institutions may be seen as an accommodation justified by secular objectives when viewed from the standpoint of the government and the political majority behind it. Those whose creeds benefit from an accommodation may well believe that the action promotes legitimate secular objectives and allows religious values to flourish of their own accord. To persons who do not adhere to the accommodated beliefs, however, the state-sanctioned presence of religion in public institutions may create pressure to conform to majority

---

**19.** Justice Jackson does go on to say that symbols have what is seemingly only a subjective meaning. "A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." *Barnette*, 319 U.S. at 632–33, 63 S.Ct. at 1182–83. While different perceivers can certainly "hear" symbolic speech differently, the meaning of the symbol cannot be merely totally subjective and emotive. A citizen who is, in Justice O'Connor's construct, presented with a message of exclusion from the political community by an action of government endorsement of religion cannot erase or dilute the endorsement effect by redacting the symbol for himself, anymore than one can subjectively recast the "badge of inferiority," as mistakenly suggested by the majority in *Plessy*. 163 U.S. at 551, 16 S.Ct. at 1143.

**20.** If there were limitations in the actual extent of religious liberty in America at the beginning of the republic, it was surely due in some measure to the fact that there was a dominant social and religious culture which, while not monolithic, was still relatively homogeneous. As William Lee Miller has observed in describing that period, "'Religious Liberty' in that mostly Protestant America had the limitation, perhaps the distortion, that such a general social ideal will have when interpreted by one dominant group, and especially when the group finds the ideal coinciding neatly with its own nature." W. Miller, *The First Liberty: Religion and the American Republic* 232 (1985).

beliefs, or send messages of exclusion from the community, despite the fact that these are neither intended nor even perceived by the majority. From the perspective of those whose beliefs are not included in the government's attempts to promote religious freedom and community self-definition, the 'accommodation of religion' may mean state favoritism among creeds or, at a minimum, state-created conditions under which majority creeds achieve *de facto* orthodoxy. For the religious minorities, this is the opposite of accommodation of *their* religions. *Developments of the Law: Religion and the State*, 100 Harv.L.Rev. at 1646 (emphasis in original). This court believes that there are two important considerations when examining the effects and dangers of the interaction between symbolic religious speech and government endorsement. The first is the danger of the majority ideology seeming to be the most normal, acceptable, or appropriate ideology. *See, e.g.*, Tribe, *Constitutional Calculus: Equal Justice or Economic Efficiency?*, 98 Harv.L.Rev. 592, 611 (1985) ("When the government dons religious robes, those vestments are least visible to those who wear the same colors.") Second, if the danger of endorsement is the danger of a government *imprimatur* given to a particular sect, there may be a greater danger of an unintentional *imprimatur* in the case of symbolic speech, because it is easier for endorsement to slip in through the meaning-giving context of the symbolic speech and to end up with a seeming, if unintentional, endorsement of the content of the belief.[21] In the case before us, the vividness of the message of endorsement and the concomitant ineffectiveness of the disclaimers show in stark terms the power of symbolic speech. Not only were the disclaimer signs relatively small, but the message of endorsement conveyed by the symbolic embrace of the creche by government simply overwhelmed any attempt to disclaim.

### B.

While not essential to the holding, this court nonetheless believes it to be important to make several additional points which will serve to set its decision in context and to describe how circumscribed are the effects of the decision. Within the contours of this matter, the court feels that it can follow, in complete repose, the venerable directive *"fiat justitia, ruat coelum."* ("Let justice be done, though the heavens should fall.") This court has "done justice" as it interprets the precedents, and it assures those who meet its ruling with some trepidation that the sky will indeed not fall. Contrary to the alarms of many who are deeply critical of recent Establishment Clause jurisprudence, this decision, and the decisions of other courts which are consonant with it, do not bar religion from the public square and do not remove religion from public discourse. *But see, e.g.*, R. Neuhaus, *Naked in the Public Square* (1980). Disestablishment is not a threat to the presence of religion in public life, because what separation exists is a separation of religion from government, not from politics. Tribe, *American Constitutional Law* at 1276.

Clearly, as at least one commentator has noted, *Lynch* was motivated in large measure by the hallowed place which the former Chief Justice saw religion as having in American life. Howard, *The Supreme*

**21.** As a vivid example of endorsement, *see Friedman v. Board of County Commissioners of Bernalillo County*, 781 F.2d 777 (10th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). The Tenth Circuit Court of Appeals held that the use of a county seal containing a Latin cross and the motto *"Con Esta Vencemos"* ("With This We Conquer") violated the Establishment Clause. Finding that "an implicit symbolic benefit [to religion] is enough" to render the seal unconstitutional, *id.* at 781, the Tenth Circuit described the endorsement danger in this way:

> A person approached by officers leaving a patrol car emblazoned with this seal could reasonably assume that the officers were Christian police, and that the organization they represented identified itself with the Christian God. A follower of any non-Christian religion might well question the officers' ability to provide even-handed treatment. A citizen with no strong religious conviction might conclude that secular benefit could be obtained by becoming a Christian.
>
> *Id.* at 782.

*Court and the Serpentine Wall,* in The Virginia Statute for Religious Freedom 313–22 (in M. Peterson and R. Vaughn, eds.) (1988). The decision of this court does not remove religion from public life or reflect a devaluing of the role of religion as Chief Justice Burger described it in *Lynch.* This decision only involves what is at most a marginal or incremental geographical restriction on a certain type or display of symbolic speech. There is without question still an entire panoply of fora in the area for the type of symbolic religious speech which is at question in this case.

Litigants seeking to enlarge the scope of government action toward religion permitted by the Establishment Clause seemingly universally quote as a reflex action Justice Douglas' observation that "We are are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). As a descriptive statement that observation is unexceptionable. The religious history of this country forms an essential backdrop to and offers an explanation of the other aspects of this country's history.[22] *See, e.g.,* S. Ahlstrom, *A Religious History of the American People* (1972). It is an extremely large step, though, to turn Justice Douglas' descriptive observation about our intellectual and political antecedents into a normative mandate that the government support various religious sects. And while this first part of

Douglas' observations is often quoted, perhaps less often utilized is a point he makes later in the same paragraph: "We [the American people] sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Id.* This second observation of Douglas' seems intent on preserving one of the foundational components of free exercise and establishment values, the principle of voluntarism.[23] *Walz,* 397 U.S. at 694, 90 S.Ct. at 1424 (Harlan, J., concurring in result).

The intellectual history which is bound up with the creation and the interpretation of the religion clauses of the first amendment show that the Establishment Clause is neither born out of hostility to religion nor will it undercut the potency of American religious life.[24]

The *amicus* accuses plaintiffs of wanting "to extirpate religion from public life" and of showing hostility to religion. Amicus brief in opposition plaintiffs' motion for summary judgment in support of defendants' cross motion for summary judgment, 32. The *ad hominem* nature of this argument aside, those charges against plaintiffs are not borne out by the record and the amicus' implicit deeper charge, that a separationist impulse in the relationship between church and state is hostile to religion, is also not credible. The urge for disestablishment and the degree of separa-

---

**22.** A number of historians and theologians have identified theological influences at work behind crucial characteristics of our policy. For example, in thinking about theological themes and the Constitution, some historians have noted the prominence of the motif of "law" in Calvinism and, thus, in one of the most important intellectual influences in our early history, the Congregationalists. In particular, one historian has speculated that this could be a root of our enduring national "piety"—our reverence for the Constitution and for law. S. Ahlstrom, *A Religious History of the American People* 348 (1972).

**23.** Arguing from a position which is theologically informed, Dean Kelley analogizes the principle of voluntarism to the spirit of "free enterprise," contending that "these practices [e.g., municipal displays of religious symbols] should be rejected as state proprietorships in religion— *prima facie* violations of the principle of free

enterprise in the realm of religion." Kelly, *Free Enterprise in Religion, Or How the Constitution Protects Religion and Religious Freedom,* quoted in L. Levy, *The Establishment Clause: Religion and the First Amendment* 117 (1986).

**24.** This court is well aware that mere invocation of history alone will hardly serve to solve the issue. *See Lynch,* 465 U.S. at 718–19, 104 S.Ct. at 1382–83 (Brennan, J., dissenting); Tribe, *American Constitutional Law,* 1164. This court is also aware that much potential for the misuse of history exists, such as blithely citing detached bits of data or using history to prove too much. *See* H.J. Powell, *Rules for Originalists,* 73 Va. L.Rev. 695 (1987). However, even a cursory examination of some of the intellectual artifacts of the first amendment can serve to diffuse some of the well-meant but overstated fears about the consequences of a judicial decision such as this.

tionism which disestablishment may entail were assuredly not born out of any hostility to religion. The historian Leonard Levy notes that some critics of recent church and state jurisprudence

> seem to have no historical memory. They write about the Establishment Clause as if it were an enemy of religion rather than religion's bulwark, and they convert the Clause into an antithesis of religious liberty, when in fact it is an additional guarantor of the rights of conscience.... The Establishment Clause ... is a legacy not of Deists but of profoundly believing Christians....

L. Levy, *The Establishment Clause: Religion and the First Amendment*, 118 (1986).

The disestablishment principle embodied in the first amendment is, on its own terms, a unique act of faith, for it is presumptively different from the more anemic position exemplified by the English philospher John Stuart Mill that religious tolerance exists only through indifference to religion or because of intellectual exhaustion.[25] J.S. Mill, *On Liberty*, 67 (G. Himmelfarb ed.)

**25.** "Yet so natural to mankind is intolerance in whatever they really care about that religious freedom has hardly anywhere been practically realized, except where religious indifference, which dislikes to have its peace disturbed by theological quarrels, has added its weight to the scale." J.S. Mill, *On Liberty*, 67 (G. Himmelfarb ed.) (1982).

**26.** *See e.g.*, the conclusions of historian Leonard Levy: "Because the domains of religion and government remain separated, religion in the United States, like religious liberty, thrives mightily, far more than it did 200 years ago, when the vast majority of Americans were religiously unaffiliated." Levy, *The Establishment Clause* 181.

**27.** As David Little, a scholar of American religious history, has noted,

> For Jefferson and Madison, on the contrary, established religion of any sort contributes to the moral and civil corruption of the social order. It predictably produces "hypocrisy, injustice, intemperance, immoderation, tyranny, and intolerance"—hardly the sort of civic behavior necessary for preserving and edifying a free society.
> ... [T]he basis for "the vital Principles of republican Government," the principles of "Justice and Virtue," derive not from a com-

(1982). The disestablishment principle reflects an American commitment that religious liberty is possible without devaluing the place of religion in public life, without a cooling of religious fervor, and with a continued appreciation of religious diversity. On the contrary, the disestablishment of religion is a prime factor in the health, vitality, and variety of American religious life.[26] James Madison argued persuasively that religion is more vital when disestablishment is the rule. "[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." J. Madison, *Memorial and Remonstrance Against Religious Assessments* (reprinted in *Everson*, 330 U.S. at 67, 67 S.Ct. at 536). In Madison's view, it is not the disestablishment of religion—the separation of religion from government and its trappings—which threatens religious vitality, but rather a regime of fullbodied establishment, like the Constantinian captivity of Christianity which would imperil our religious health.[27] *See*, A.E.D. Howard, I *Commentaries on the Constitution of Virginia*, 288 (1974).[28]

> mon religion, but from the common respect of all citizens and the common design of all public institutions for protecting the free exercise of diverse religious and even nonreligious and irreligious expression. Such an idea is avowedly the implication of Jefferson and Madison's doctrine of the sovereignty of conscience.

Little, *Religion and Civil Virtue in America*, in The Virginia Statute for Religious Freedom 244 (M. Peterson and R. Vaughan, eds. 1988).

**28.** At this point it may be appropriate to note that those concerned with the vindication of religious liberty in this Commonwealth have recourse to resources other than the United States Constitution. In particular, the Supreme Court has noted that state constitutions may provide protections for civil liberties more expansive than the protections provided by the United States Constitution. *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The protections afforded by the United States Constitution must be considered a floor, so that no state constitution may be read to afford protections less potent than those contained in the federal constitution. However, the guarantees of the federal constitution are not a ceiling. A state's own history will affect its constitutional provisions regarding religion and the doctrinal possibilities

Surely, some citizens will regret this court's decision and ask, with the best of intentions, why something as seemingly innocuous, and, to their perception, as unobtrusive as this creche cannot be displayed on the County Office Building lawn. They may feel that, even if it is in some sense what they might term a "technical" violation of an Establishment Clause, it surely is only a trivial or insignificant violation and that such violation should not prevent the goodwill which they believe this display engenders. An answer to this concern would simply be to cite *Widmar* and note that a state has a compelling interest in preventing a violation of the Establishment Clause. *Widmar*, 454 U.S. at 271, 102 S.Ct. at 275.

The well-intentioned concern, though, perhaps merits several deeper responses. First, this court would note that whether a violation of the Establishment Clause seems trivial will be due in large part to the perspective of the observer. A member of a religious or cultural majority or an adherent of the sectarian belief being endorsed by the state may well fail to see what the fuss is all about. To that extent, it may well be fair for those feeling exclusion through state endorsement of a religious ideology to ask those comfortably ensconced within that ideology to attempt to appreciate, if they cannot share, the perspective of the one excluded by the government endorsement.[29] Because

through the symbolic embrace of a potent religious symbol by the trappings of government, the government sends out a message of endorsement of a particular religious affiliation or cluster of affiliations, the case at hand is not a *de minimis* or trivial violation of the Establishment Clause.[30]

There may be some putative or ostensible entanglements between church and state which, when put in context, are truly *de minimis*. Some religious symbols have become less potent and some practices which might have once had the potential to be divisive or pernicious have been declawed. As Justice Brennan noted in his dissent in *Lynch*,

> I would suggest that such practices as the designation of 'In God We Trust' as our national motto or the references contained in the Pledge of Allegiance to the Flag can best be understood ... as a form of 'ceremonial deism,' protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content.

*Lynch*, 465 U.S. at 716, 104 S.Ct. at 1382 (Brennan, J., dissenting). In similar fashion, the Fourth Circuit Court of Appeals has noted that the sort of practices referred to by Justice Brennan have lost their "potentially entangling theological significance," *Hall v. Bradshaw*, 630 F.2d 1018,

---

which such a provision will spawn. Howard, *State Courts and Constitutional Rights in the Day of the Burger Court*, 62 Va. L.Rev. 873, 909 (1976). In addition, the willingness and ability of state courts to fashion state constitutional remedies is in large part a function of the specificity and robustness of that state constitution's own religion clause. Note, *Beyond the Establishment Clause: Enforcing Separation of Church and State Through State Constitutional Provision*, 71 Va. L.Rev. 625, 653 (1985). Forty-one years ago in its *Everson* decision, the Supreme Court read the Virginia Bill for Religious Liberty as being identical in its protections with the first amendment. *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Va. Const. art. I § 16. However, as one commentator has noted, "So many of the milestones of religious liberty, such as Jefferson's Bill for Religious Liberties and Madison's Memorial and Remonstrance, have sprung from Virginian sources that it is not surprising if the

Virginia courts see Virginia's religious guarantees as having a vitality independent of the federal Constitution." A.E.D. Howard, I *Commentaries on the Constitution of Virginia* 303 (1974).

**29.** One commentator has suggested that "In deciding whether a government practice would impermissibly convey a message of endorsement, one should adopt the perspective of a non-adherent; actions that reasonably offend nonadherents may seem so natural and proper to adherents as to blur into the background noise of society." L. Tribe, *American Constitutional Law*, 1293.

**30.** As a prominent historian of church and state has observed, "Whether a practice seems *de minimis* may depend on the perspective from which it seen. What is trifling to the majority may be threatening and offensive, even persecuting, to a minority." Levy, *The Establishment Clause* 177.

1023 (4th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981), and "In a very real sense they may be treated as 'grandfathered' exceptions...." *Id.* at 1023 n. 2. The Fourth Circuit identifies the members of this "grandfathered" class as those "Present at the very foundations, few in number, fixed and invariable in form, confined in display and utterance to a limited set of official occasions and objects, [which] can safely occupy their own small unexpandable niche in Establishment Clause doctrine." *Id.* at 1023 fn. 2. The display in question in this matter differs substantially from the "grandfathered" class described by the Fourth Circuit, for creches were hardly present at the very foundation of the Republic,[31] the display in question is neither formulaic in the sense that a national motto is, nor is it frozen nor limited. This delimited class described by the Fourth Circuit is a group of practices whose effects are clearly circumscribed and are not expansive, like the message of endorsement communicated by the creche being displayed on the front lawn of the County Office Building.

While the impact of the endorsement at work in this case is not trivial, this court recognizes that there could be points of connection between church and state which are truly *de minimis*, in terms of an Establishment Clause violation. In attempts by citizens of goodwill to seek a relationship between church and state which promotes a fertile ground for religious liberty for all citizens (or from freedom from religion, if the citizen so elects) there is some room for compromise, for seeing some suits as *de minimis* and for not always seeking confrontation or adjudication.[32] This court sincerely hopes that those who would be involved in legal, political, or intellectual efforts to shape the relationship between church and state will appreciate the difference between suits of import and "silly suits."

V.

In conclusion, this court finds that the display of the creche was a violation of the Establishment Clause and grants plaintiffs' motion for summary and declaratory judgment.

An appropriate Order shall this day issue.

ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED

as follows:

1. Plaintiffs' motion for summary judgment shall be, and it hereby is, granted.

2. Defendants' motion for summary judgment shall be, and it hereby is, denied.

3. This action shall be, and it hereby is, dismissed and stricken from the docket of this court.

---

**31.** For a survey of the variegated history of Christmas celebrations in this country and an indication of how relatively young are many of the seasonal practices assumed to predate this country, *see Lynch,* 465 U.S. at 720–25, 104 S.Ct. at 1383–87 (Brennan, J., dissenting).

**32.** Indeed, Leonard Levy, in his defense of a separationist view of church and state, readily concedes that there are "some silly suits" and that there are times, in his homely phrase, that we should "let sleeping dogmas lie." Levy, *The Establishment Clause* 177.